389 So.2d 1142 (1980)
John F. MANZANARES et ux., Plaintiffs-Appellants,
v.
AMERICAN INTERNATIONAL FOREST PRODUCTS, INC. et al., Defendant-Appellee.
No. 7772.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1980.
Writ Refused December 5, 1980.
*1143 Edwards, Stefanski & Barousse, Homer Ed Barousse, Jr., Crowley, for defendant-appellant-appellee.
Sandoz, Sandoz & Schiff, Lawrence B. Sandoz, Jr., Opelousas, for plaintiff-appellee-appellant.
Morrow & Morrow, J. Michael Morrow, Opelousas, for plaintiffs-appellees-appellants.
Dubuisson, Brinkhaus & Dauzat, Edward B. Dubuisson, Opelousas, for defendants-appellees.
Franklin, Moore & Walsh, Charles O'Brien, III, Baton Rouge, for defendant-appellee.
Before CULPEPPER, SWIFT and DOUCET, JJ.
*1144 SWIFT, Judge.
In May of 1977 Mr. and Mrs. John Manzanares, the plaintiffs, entered into a building contract with J. L. Pitre, a carpenter-contractor, for the construction of their home near Leonville, Louisiana. The Manzanares desired a rustic look for the interior of their home and selected 1" × 12" Ponderosa Pine boards for the paneling from a sample brought them by Mr. Pitre which he had obtained from Pierre Guidry & Son, Inc., a building materials retailer. Thereafter, the interior of the home was paneled with 4500 board feet of this material that was manufactured by Wickes Forest Industries, a division of The Wickes Corporation. The home was completed in July of 1977. During the months of December, 1977, and January, 1978, after the use of the central heating system, the plaintiffs began to notice that the pine was "shrinking", resulting in some splitting of the boards and cracks nearly ¼ inch in width where they were supposed to join which exposed the insulation in the walls behind the paneling. The wood shrank throughout the house.
The Manzanares filed this lawsuit against Pitre, Pierre Guidry & Son, Inc. (Pierre Guidry), American International Forest Products, Inc. (American) and its insurer, Safeco Insurance Company of America (Safeco), the Wickes Corporation (Wickes) and its insurer, Travelers Insurance Company (Travelers), alleging the wood used was defective and seeking damages.
After trial on the merits, in answers to interrogatories, the jury found the lumber was defective because of its high moisture content at the time it was sold by the lumber dealer, Pierre Guidry, but that it did not contain excess moisture which constituted a redhibitory defect when it left the custody of Wickes. Therefore, the judgment was cast against Pierre Guidry on the jury's finding that the lumber gained moisture in its custody which caused the shrinkage.
It was agreed by the parties that the trial judge would rule on all matters not decided by the jury. He concluded that J. L. Pitre also was legally responsible for installing the defective material and rendered judgment against him as well. However, Mr. Pitre was allowed indemnity on his third party demand against Pierre Guidry, as a good faith seller with recourse against his vendor. A total award of $19,000.00 was granted the plaintiffs. The Manzanares, Pitre and Pierre Guidry have appealed. The other parties have answered the appeals.

THE MANUFACTURER'S LIABILITY
The first issue with which we are confronted is whether the jury erred in finding the lumber did not contain a redhibitory defect at the time it left the custody of the manufacturer, Wickes.
The evidence indicates that the particular No. 3 common Ponderosa Pine that Pierre Guidry sold to Pitre for use in the Manzanares home was ordered by the lumber dealer from American, a broker, who in turn ordered it from Wickes. The order was for a flatcar load of lumber, kiln-dried and paper-wrapped. It was shipped by Wickes directly to Pierre Guidry and was never handled by American.
James R. Hogue, the sales and traffic manager for Wickes at Grangeville, Idaho, who qualified as an expert in the field of lumber, testified that to be labeled "kiln-dried" the Ponderosa Pine must have a moisture content not greater than 19%. Except for railroad ties, no lumber is produced at the Grangeville plant that is not kiln-dried. The wood stays in the kiln for drying for more than a day. Because it passes through many hands and there are various grades and moisture checks along the way, there is little chance of the lumber getting shipped without being inspected. He admitted that every board is not examined, but random samplings of the wood are made periodically for moisture content.
Mr. Hogue further testified that wet lumber comes out very fuzzy after planing and is therefore recognizable. He said that it is a natural property of wood, especially in this part of the country, to absorb moisture from the air. Consequently, even after *1145 the excess moisture is taken out of the wood at the plant, it has a tendency to pick up moisture after arrival in Louisiana. Then, once it is put in a home and central heat is used, it is natural for the lumber to lose moisture and shrink. There are other grades of Ponderosa Pine than the No. 3 employed in this instance which will not shrink, however. No. 3 is used primarily for shelving.
Another expert in the field, Mr. Neil Pinson, who is the technical director for Western Wood Products Association, testified that if the lumber had not been kiln-dried to a moisture content of 19% and as in this case shipped in April but not used in a home until late May or July, normally he would expect mildew to develop. He further testified that kiln-dried lumber, subjected to high temperatures and relative humidity for two to three months and even though in a covered shed, will increase in moisture content to about 20.2%. He examined the moisture readings taken in the plaintiffs' home, which ranged from 9.2% to 11.9%. He testified that if a piece of 1" × 12" Ponderosa Pine is reduced from 18% to 10% moisture content, it will shrink slightly less than ¼ inch in width. After measuring several of the boards from plaintiffs' home and taking into consideration that 12-inch boards are required to be only 11¼ inches wide, he concluded that their shrinkage was not disproportionate as they averaged 111/8 inches for a board. However, he added that in some places the cracks between the boards were wider than the shrinkage would indicate they should have been. This was explained as being due to the "crook" in this less expensive grade of lumber.
Further, Mr. Herman Guidry, the president and owner of the lumber company, testified that what he received from Wickes was "exactly what we wanted, a beautiful grade of No. 3, kiln-dried." He personally saw this shipment and helped unload it. It was stored in covered sheds. He denied the lumber was defective, but said it should not have been used for paneling. It was purchased mainly for use as shelving. The salesman for Pierre Guidry, Kenneth Daigle, testified it was a good shipment of lumber.
On the other hand, another expert, Mr. Roy Elder, the general manager of the distribution yard of the Powell Lumber Company in Lake Charles, expressed the opinion that the lumber could have accumulated moisture in transit or that some of the boards may not have been properly dried because of improper circulation in the kiln. He said that most 1" × 12" No. 3 Ponderosa Pine sold by his company is used for shelving, but that it could be used for paneling and is, at least in some parts of this country. However, in Louisiana a tongue and grove application is employed to reduce the problems resulting from shrinkage.
It is well settled in our law that the findings of fact of a jury which are reasonably supported by the record should not be disturbed on appeal unless they are clearly wrong. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). From our review of the evidence, we believe there was a reasonable factual basis for the jury's finding that the lumber was not defective when it left Wickes' custody and that it was not clearly wrong in this respect.
The plaintiffs also contend that the jury erred in not finding that Wickes or American improperly shipped the Ponderosa Pine to the dealer, Pierre Guidry, or at least failed to adequately warn prospective buyers of the possible results in using the lumber. We find no merit to either argument.
There is no evidence in the record which indicates that the lumber was improperly shipped by Wickes or the broker, American.
In regard to Wickes' alleged failure to warn, Mr. Pinson testified that there is a booklet distributed by his association and used throughout the lumber industry which covers the shrinkage properties of different wood. Mr. Guidry said that his company had not received any pamphlet from Wickes saying this lumber should not be used for paneling. However, he testified he knew this should not be done, particularly in the *1146 manner applied in the plaintiffs' house, as he was aware that soft wood coming into this area expands and contracts because of the effect of the climate on its moisture content. Mr. Guidry termed such use of this lower priced lumber as "ridiculous". We do not believe Wickes or American were under a duty to advise of the inherent nature and shrinkage characteristic of the wood under these circumstances, especially since their buyer, the lumber dealer, admittedly was aware thereof.

THE SELLER'S LIABILITY
Pierre Guidry contends the jury's verdict was in error in finding the lumber gained moisture while in its custody that caused the shrinkage and constituted a redhibitory defect of which the seller was aware.
As mentioned above, the president of this concern acknowledged he was aware of the nature of this lumber and that it should not have been used for paneling because of the moisture content. His information on the subject, of course, is also that of his company. There was a conflict between the testimony of Mr. Pitre and Messrs. Guidry and Daigle as to whether Pierre Guidry knew this Ponderosa Pine was going to be used for paneling. Daigle admitted, however, he was told about its intended use after about the third order, but did not caution Pitre against such use because he had no idea there would be any problems with it.
We are unable to say the jury was clearly wrong in its finding that the lumber became defective for use as paneling while in Pierre Guidry's custody and the seller knew of the vice.
The plaintiffs further contend the award was insufficient and should be increased. We find no merit in this plea.
The measure of recovery by a purchaser from a seller or by a homeowner against his contractor for a defectively constructed building is generally the cost of repairs necessary to convert the unsound structure to a sound one or the amount paid to remedy the defect. Brown v. Dauzat, 157 So.2d 570 (La.App. 3 Cir. 1963); North American Contracting Corp. v. Gibson, 327 So.2d 444 (La.App. 3 Cir. 1976). Additionally, if the seller knew of the vice and failed to declare it he is also liable for expenses, other damages and attorney's fees. Huffman-Euro Motors v. Physical Therapy, Etc., 373 So.2d 565 (La.App. 3 Cir. 1979).
Mr. Samuel Hollier, a witness for the plaintiffs, estimated the cost of repairing this house to be as follows:

1) Materials: $3,300.00
2) Carpenter Labor: 6,200.00
3) Painting: 3,500.00
4) Damage done to ceiling
 and floors: 2,000.00

Of these figures, the jury awarded all but the amount estimated for labor, allowing only $4,600.00. Mr. Hollier testified he would hire three men for approximately three weeks at $10.00 per hour, working 40 hours each week to do this work. Our calculations indicate the cost of such labor would be $3,600.00. Therefore, the jury award in this respect was not insufficient.
The plaintiffs further contend that the $600.00 award for motel expenses to be incurred by them while the home is under repair is inadequate. Mr. Manzanares said that a motel room for his family would cost $29.50 per day. Thus, the cost of a motel room for three weeks would approximate $600.00 and the jury award for this item was reasonable. The plaintiffs' judgment also included $1,000.00 for embarrassment and $4,000.00 for their attorney's fee. Counsel for the plaintiffs contend that the latter award was too low. His testimony enumerated the work he has done in preparation for this lawsuit, but he kept no time sheet and made no estimate of the number of hours he worked. From our review of the record we cannot say that the award for this item was beyond the limit of the discretion of the lower court.
Plaintiffs' counsel also requests an additional fee for the legal services performed on appeal. As the plaintiffs' request for additional relief not granted at the trial level is being denied on appeal, additional attorney's fees for the services *1147 rendered in this court are not warranted. Conlay v. Houston General Ins. Co., 370 So.2d 196 (La.App. 3 Cir. 1979), writ granted, La., 371 So.2d 618 but dismissed, La., 374 So.2d 650; Gagnard v. Travelers Ins. Co., 380 So.2d 191 (La.App. 3 Cir. 1980).

THE BUILDER'S LIABILITY
The only other issue remaining for our consideration is whether the trial judge was wrong to impose liability on Mr. Pitre, the builder, despite the jury's apparent finding that he did not use the lumber improperly. In doing so, he relied on the following language from Brown v. Dauzat, supra, which was taken from Tuminello v. Mawby, 57 So.2d 666, 668 (La. 1952):
"The artisan, craftsman, builder, or manufacturer is always presumed to know of the vice or defect in the article he constructs, manufactures, or builds."
Pitre contends he is liable only for defective workmanship and not for using allegedly defective material where he had no knowledge of the defect and it was not readily discoverable, citing LSA-C.C. Art. 2762. That article provides:
"If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks." (Emphasis added.)
In support of this contention, Pitre's counsel cites Murphy Corporation v. Petrochem Maintenance, Inc., 180 So.2d 716 (La. App. 1 Cir. 1965). In that case the plaintiff provided two underground storage tanks which the defendant installed. After acceptance of the work one of the tanks was found to have a leak. The court concluded Petrochem was not liable since it could not be held responsible for defects in materials which it did not provide and which were not patent or discoverable on reasonable inspection. In the present case, however, the contractor provided the materials, not the plaintiffs.
With regard to the other cases cited by Pitre, it was not established that the defective floor coverings involved were caused either by bad workmanship or the use of defective materials by the installers thereof. Instead, it appears the tile came loose because of seepage of moisture through improper foundations constructed by others.
While we think the trial judge erred in relying on Brown in this respect, we agree with him that the plaintiffs are entitled to judgment against the builder also, except for the $4,000.00 awarded for their attorney's fee. Brown involved a sale of a home and lot with a defective foundation and LSA-C.C. Art. 2520 and the principles of redhibition were applicable. In the instant case, however, the relationship between the plaintiffs and Mr. Pitre is that of owner-contractor rather than vendor-vendee. Consequently, the rights of these parties are covered by Articles 2762-2769 of our civil code. Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (La.1967); Unverzagt v. Young Builders, Inc., 207 So.2d 405 (La. App. 3 Cir. 1968); Catalina Pools v. Sellers, 322 So.2d 812 (La.App. 4 Cir. 1975).
Although Article 2762 speaks only of the undertaker bearing the loss caused by "badness of the workmanship", it comprehends both defective construction and the use of faulty material. Parker v. Brown, 150 So.2d 306 (La.App. 2 Cir. 1963). In Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App. 2 Cir. 1974) the court said:
"There is little dispute as to the principles of law governing this case. It is implicit in every building contract that the work of the builder be performed in a good, workmanlike manner, free from defects either in materials or workmanship. An owner seeking to recover from the contractor has the burden of proving both the existence and nature of the defects, that the defects are due to faulty materials or workmanship and the cost of repairing the defects. LSA-C.C. Arts. 2762 and 2769." (Emphasis added).
*1148 Negligence or knowledge of the defect by the contractor was not mentioned in that case and we conclude that to recover under Article 2762 the owner need only establish that the ruin was caused either by defective materials used by the builder or his bad workmanship.
Having established that defective lumber was used by the contractor in this instance, the plaintiffs are entitled to judgment against him as well as the lumber dealer in solido, but only up to the sum of $15,000.00. A homeowner cannot recover attorneys fees from his contractor under these circumstances unless specified in the building contract. Kegler's Inc. v. Levy, 239 So.2d 450 (La.App. 4 Cir. 1970); Seymore v. La. Soil Stabilization Co. Inc., 381 So.2d 571 (La.App. 2 Cir. 1980).
We further agree with the trial judge that Mr. Pitre is entitled to indemnity on his third party demand against Pierre Guidry, who sold him the lumber knowing that it was unfit for use as paneling in the residence he was constructing.
For the foregoing reasons, the judgment of the district court is amended to reduce the amount thereof in favor of the plaintiffs against defendant, J. L. Pitre, to the sum of $15,000.00. Otherwise, it is affirmed.
AMENDED AND AFFIRMED.