GRISBAUM, Judge.
Plaintiffs, Pamela and Eddie Maltzahn, appeal a dismissal of their suit against Bruce Roch, a building contractor, and Du-rock, Inc., a concrete supplier, and its insurer, United States Fidelity & Guaranty Company, for an alleged defective garage slab. We reverse in part and affirm in part.
The issues presented are as follows:
(1) Whether the garage slab was defective?
(2) Whether the building contractor is liable to plaintiffs under La.C.C. art. 2762 and 2769?
(3) Whether the concrete supplier is liable to plaintiffs under the redhibition or quanti minoris articles, La. Civil Code articles 2520 et seq.?
(4) What damages, if any, are the plaintiffs entitled to if a defective condition is found?
Plaintiffs entered into a written contract with defendant Bruce Roch, a contractor, to construct a residence in Metairie, Louisiana which required the laying of a concrete slab with a minimum of 2500 p.s.i. strength. Subsequent to the written contract, Roch agreed to lay a concrete slab for a proposed garage while the foundation slab on the house was being poured. In this oral agreement there were no specific statements made as to the appropriate p.s.i. strength of this garage slab. Roch contracted with Du-roek, Inc., a contract supplier, to provide concrete with 2500 p.s.i. Both slabs were poured on September 9, 1978.
Approximately five or six months later while construction of the Maltzahn home continued, plaintiffs notified Roch that the garage slab was crumbling. Roch inspected the slab; however, nothing further was done until September of 1979 when plaintiff hired a consulting engineer to test the slab. The test of the slab indicated that the right portion and parts of the perimeter of the slab were approximately 1100 p.s.i. or less. Plaintiffs notified the contractor of this condition, and the contractor likewise notified the supplier of the concrete. The concrete supplier sent an expert to test the slab who found that the ledge was less than 2500 p.s.i. He recommended that this condition be corrected by a two-part component epoxy grout applied to the periphery areas and a portion of the right side of the slab.
In negotiations among the parties for the correction of the problem, the concrete supplier declined responsibility for supplying concrete at less than 2500 p.s.i. The contractor testified that he offered to make certain corrective work consisting of pouring an additional four inches of concrete on top of the existing garage slab, “capping the slab.” The purpose of this corrective work was to provide increased load bearing strength and to increase the height of the slab for flood protection.
The contractor’s arrangements were found to be unacceptable to plaintiffs, and plaintiffs filed suit June 6, 1980 seeking to have the slab removed and completely replaced by a new slab. They also claimed damages for mental anguish, inconvenience, *588 and attorneys fees. Roch answered plaintiffs’ suit and reconventionally demanded the remaining amount due on the contract price, $230.12. Roch further filed a third-party demand against Durock, Inc. and USF & G alleging if the slab was found to be defective, the defective concrete slab was the result of defective concrete supplied by Durock, Inc. Defendants, Durock, Inc. and USF & G, also answered plaintiffs’ suit and filed a third-party demand against Bruce Roch claiming if the slab was defective, the defects were the result of negligence on the part of the contractor, Roch, and his employees.
CONDITION OF THE CONCRETE SLAB
In order for the plaintiffs to recover against the contractor and/or the concrete supplier, it is first necessary that a defective condition be shown by a preponderance of the evidence. At trial, plaintiffs and defendant concrete supplier presented expert testimony as to the condition of the concrete slab. Both experts, as well as the contractor himself, testified as to the existence of a substandard “condition” near the perimeter of the slab.
Plaintiffs’ expert stated the perimeter lacked the 2500 p.s.i. compressive strength expected for a residential type structure. He found the perimeter to have the concrete compressive strength of 1100 p.s.i. More specifically, he found the peripheral area on the right and left sides as well as the rear periphery with less compressive strength than the center of the slab. This 1100 p.s.i. he noted was below FHA and VA standards. He opined those particular areas were below the recommended p.s.i. due to the presence of excessive water in the concrete which weakens concrete. When questioned as to whether 1100 p.s.i. was adequate to support a one or two story structure safely, he stated that he would not recommend this strength and further stated that it would be questionable as to whether it would perform satisfactorily.
Durock’s expert similarly found the ledge between 1100 to 1600 p.s.i. It was his opinion that the concrete on the right side of the slab was “rather fluid” meaning that the concrete contained additional water. He further explained that this area had not been properly compacted because it had valleys, lagoons, and summits underneath where a two by six had laid to form the ledge.
Finally, the defendant contractor admits ted at trial that there was “bad concrete” (“underweight” concrete) on the right side of the slab. He admitted that the garage slab “didn’t finish correctly” on the right side. He stated, “It looked to be sandy.” When questioned by the judge as to whether the mix was not proper, he responded, “That’s what I would assume.” On cross-examination, the concrete supplier’s counsel questioned Roch in the following manner: “And it’s your testimony that even though you believed that there was something the matter with this cement and could notice it several hours afterwards, you never brought this to the attention of the people at Durock, Inc. or mentioned that there may be some problem with the concrete they delivered?” Roch answered, “No, I didn’t. I didn’t bring it to their attention until he (Mr. Maltzahn) had the problem, and then their (Durock’s) first reaction is always, it’s not the concrete.”
There was, therefore, undisputed testimony that the perimeters of the concrete slab were “underweight.” Both experts and the contractor stated that with repair the slab could withstand a one or two story building. Importantly, when questioned as to the sufficiency of what was characterized as Du-rock’s expert suggested “cosmetic” repair, defendants’ expert responded that his suggested repair, namely a two-part component of epoxy grout and concrete patching, was not a mere “cosmetic” repair but rather a “structural” repair. We, therefore, conclude that the plaintiffs have shown by a preponderance of the evidence that a defective condition was present in the concrete slab.
BUILDER’S LIABILITY
The appropriate law governing the rights and responsibilities between plaintiffs and the defendant building con *589 tractor is set forth in our Civil Code, Book III, Title IX, Section 3, entitled “Of Constructing Buildings According to Plots, and Other Works by the Job, and of Furnishing Materials” and more specifically, arts. 2762 and 2769. See, Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (La.1967); Manzanares v. American International Forest, 389 So.2d 1142, 1147 (La.App. 3d Cir.1980); Martin v. AAA Brick Co., Inc., 386 So.2d 987, 990-91 (La.App. 3d Cir.1980).
La.C.C. art. 2762 provides:
“If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood and-with frames filled with bricks.”
This article comprehends both defective construction and the use of faulty material. Manzanares, 389 So.2d 1142, 1147; Parker v. Brown, 150 So.2d 306 (La.App. 2d Cir. 1963).
The liability of a contractor for failure to properly perform a building contract is set forth in art. 2769 which provides:
“If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.”
Moreover, the court in Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345, 346 (La.App. 2d Cir.1974) interpreting these articles stated:
“It is implicit in every building contract that the work of the builder be performed in a good, workmanlike manner, free from defects either- in materials or workmanship. An owner seeking to recover from the contractor has the burden of proving both the existence and nature of the defects, that the defects are due to faulty materials or workmanship and the costs of repairing the defects.”
As discussed above, plaintiffs have proven that the right portion and periphery of the garage slab contained defective concrete. While there is conflicting testimony as to the cause of the weakened condition— plaintiffs’ expert concluding it was caused by excess water in the concrete; concrete supplier’s expert admitting “fluid” concrete but stating that the concrete had been improperly compacted; and finally, the contractor stating the concrete used on the right side “looked to be sandy,” — the contractor, by his own admission, knew there was improper concrete but continued to use it. These circumstances satisfy the requirement that plaintiffs prove the defects were due to faulty materials or poor workmanship. The evidence does not support the trial court’s dismissal of plaintiffs’ claim against the contractor, Bruce Roch, and it was, therefore, clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
CONCRETE SUPPLIER’S LIABILITY
Both plaintiffs and defendant builder Roch in his third-party demand for indemnification claim that the concrete supplier is liable for the defective concrete under the principles of redhibition or quanti minoris. La.C.C. art. 2520 et seq. In order for either of these two parties to recover against this defendant after the three-day presumptive period provided in La.C.C. art. 2530, they have the burden of proving that a defect existed in the concrete prior to the sale of this concrete. Harris v. Drexler Motor Company, Inc., 339 So.2d 1304, 1305 (La.App. 1st Cir.1976); Guillory v. Morein Motor Company, Inc., 322 So.2d 375, 378 (La.App. 3d Cir.1975); Margan v. Precision Motors, Inc., 317 So.2d 664, 668 (La.App. 4th Cir.1975).
Neither of these litigants have shown by a preponderance of the evidence that the defective condition was present in the concrete at the time of delivery. Invoices admitted at trial show the concrete left the plant with 2500 p.s.i. and that varying amounts of water were added at the job site. While plaintiffs’ expert made inferences that a truck driver for a concrete *590 supplier “could” have added water to the last partial load, there is no testimony that this was actually done. On the contrary, several times during his testimony, Roch, the contractor, admitted there was a possibility that water “may” have been added at the location. Importantly, the job delivery ticket signed by Roch which was introduced into evidence, contained the following language: “Water added to the mix after leaving the plant only upon authorization of the consignee and at his risk.” After thoroughly reviewing this record, we find the plaintiffs Maltzahns and the third-party plaintiff Roch have failed to show by a preponderance of the evidence that the defect existed in the concrete prior to the time of acceptance at the job site.
DAMAGES
The measure of recovery by a homeowner against his contractor for defective construction is generally the costs of repairs necessary to convert the unsound structure to a sound one or the amount paid to remedy the defect. See, Manzanares, 389 So.2d 1142, 1146; North American Contracting Corporation v. Gibson, 327 So.2d 444, 450 (La.App. 3d Cir.1975). Both experts recommended as one method of repair for the slab, a capping with at least 2500 p.s.i. concrete. The cost of such a process was estimated by plaintiffs’ expert at approximately $1500. The contractor estimated that it would cost approximately $1200 to $1400 to perform this capping. We, therefore, find that plaintiffs are entitled to judgment against Roch, d/b/a Roch’s Construction for the sum of $1500, reduced by the sum of $230.12, the amount still owed on the construction contract.
The plaintiffs additionally demand damages for mental anguish, inconvenience, and attorneys fees. In this case, the nonpe-cuniary damages are denied since we find that the record does not indicate that the principal object of this contract to build a garage slab was one of intellectual enjoyment. La.C.C. art. 1934(3); See, Martin v. AAA Brick Company, Inc., 386 So.2d 987, 992 (La.App. 3d Cir.1980). Unless specified in the building contract, a homeowner cannot recover attorneys fees for his contract, and, therefore, the plaintiffs’ claim for attorneys fees is also denied. Manzanares, 389 So.2d 1142, 1148.
For the foregoing reasons, the judgment of the trial court is reversed as it relates to the dismissal of plaintiffs Maltzahns’ claim against defendant Bruce Roch. We award the sum of $1269.88 ($1500-$230.12) in favor of plaintiffs and against defendant Bruce Roch together with legal interest thereon from date of judicial demand until paid and for all costs of the proceedings in the trial court. We affirm the trial court’s dismissal of plaintiffs’ claim against Du-rock, Ine. We deny Roch’s third-party demand against Duroek, Inc. for indemnification and/or contribution. All costs of this appeal are assessed against defendant Bruce Roch.
REVERSED IN PART AND AFFIRMED IN PART.