821 So.2d 10 (2002)
AUSTIN HOMES, INC.
v.
Harold THIBODEAUX and Deborah Thibodeaux.
Nos. 01-1282, 01-1283.
Court of Appeal of Louisiana, Third Circuit.
May 8, 2002.
Rehearing Denied August 7, 2002.
*11 Richard Mary, Jefferson Joseph Moss, Jr., Moss & Bradley, Lafayette, LA, for Plaintiff/Appellee Austin Homes, Inc.
Jeffrey Ackermann Durion, McGoffin, & Stagg, Lafayette, LA, for Defendants/Appellants Harold Thibodeaux and Deborah Thibodeaux.
Court composed of NED E. DOUCET JR., Chief Judge, BILLIE COLOMBARO WOODARD, and ELIZABETH A. PICKETT, Judges.
WOODARD, Judge.
Austin Homes, Inc. filed suit against Mr. and Mrs. Harold Thibodeaux to recover costs for which it had expended, but not been paid, for building their home. The *12 Thibodeauxs counter-sued, claiming that it had breached the contract by providing substandard work. The two suits were consolidated for trial. The trial court awarded Austin $58,388.55 for work that it had done, properly, but for which the Thibodeauxs had not yet paid, and $18,570.00 in lost profits due to the Thibodeauxs' breach. Thus, it did not award damages to the Thibodeauxs because it found that they had breached the contract. They lodged this appeal.
We find that the trial court legally erred in granting Austin Homes, Inc. a blanket immunity under La.R.S. 9:2771. Thus, we conduct a de novo review, modify the judgment, and remand to determine how much of the $78,358.83 that the Thibodeauxs expended to complete the home, after Austin's departure, went towards correcting Austin's substandard work, as well as for the subcontractors' costs, both to be deducted from Austin's award.

* * * * *
On February 9, 1991, Mr. and Mrs. Thibodeaux entered into a written contract with Austin Homes, Inc. (Austin) for the construction of a new home located at 100 Villere Circle in Lafayette, Louisiana. Robert Chatham, a designer from Mobile, Alabama, sold them the plans and specifications for the Georgian style home. Afterwards, Austin reviewed the plans with various subcontractors and offered to build the Thibodeauxs' home, per the plans, for $381,500.00. The Thibodeauxs agreed and signed the contract, after which they paid Austin a $38,150.00 deposit.
Although construction began on March 25, 1991, it progressed slowly. Austin did not pour the slab for the foundation until June, three months later. Nonetheless, on August 1, 1991, the Thibodeauxs paid its first draw request of $123,606.00. In October, seven months after having started construction, Austin had not, yet, weather-proofed the house. Consequently, the wooden framing was still exposed to rain and began to rot from excessive water exposure. Notwithstanding, on December 26, 1991, Austin submitted a second draw request, totaling $51,502.50, which the homeowners refused to pay because of Frank Carruther's, a Lafayette Metro Code inspector, report, detailing rotten structural members, flooring, plates, and headers, buckling studs, and rotting out of the underside of the windows. Ultimately, after Austin remedied the problems, the house passed the Metro Code inspections. At this time and in a good faith effort to get the home weatherproofed as soon as possible, on February 4, 1992, the Thibodeauxs paid Austin $20,000.00, with an agreement to make weekly payments thereafter. Although Austin continued to work until March 24, 1992, essentially, it stopped working because the Thibodeauxs refused to pay per the agreement.
In April 1992, they hired a consultant, Mr. J. Harry Hebert, a contractor, to inspect the home and determine its progress and condition. He found excessive water damage, resulting from toe boards that were nailed through the roofing; water infiltration in the chimney area and breakfast room; a lack of rain diverters over the balcony French doors; and an improper slope on the porch balcony. He, also, noted that the jacuzzi did not have a drain or water source and that, without permission, the contractor had substituted waferboard for plywood sheeting on the walls.
On April 27, 1992, Austin submitted another draw request for $58,388.55, the amount due through March 24, 1992; however, the Thibodeauxs made no payment. Eventually, on June 19, 1992, they terminated their contract and hired Mr. Hebert to take over construction as the construction manager.
*13 Austin filed suit against them to recover costs which it had expended to build their home. They counter-sued, seeking damages for the contractor's breach of contract in the home's construction. The two suits were consolidated for trial. The trial court awarded Austin $58,388.55 for the work that it had done, properly, and for which the court found that the Thibodeauxs should have paid, as well as $18,570.00 in lost profits, because of the Thibodeauxs' breach. It did not award the Thibodeauxs damages, as it found that they had breached the contract on June 19, 1992. They appeal.

* * * * *
The Thibodeauxs argue that the New Home Warranty Act (NHWA), La.R.S. 9:3141, preempts La.R.S. 9:2771essentially, a contractor's immunity statute. On the contrary, Austin urges that it is entitled to La.R.S. 9:2771's immunity from liability because it constructed the home according to their plans and specifications.

NHWA OR LA.R.S. 9:2771
The NHWA provides for certain mandatory warranties for the purchasers and occupants of new homes in Louisiana. It, also, permits the public to use homeowners' insurance as additional protection against defects in the construction of new homes.[1] It provides:
A. Subject to the exclusions provided in Subsection B of this Section, every builder warrants the following to the owner:
(1) One year following the warranty commencement date, the home will be free from any defect due to noncompliance with the building standards or due to other defects in materials or work-manship not regulated by building standards.
(2) Two years following the warranty commencement date, the plumbing, electrical, heating, cooling, and ventilating systems exclusive of any appliance, fixture, and equipment will be free from major structural defects due to noncompliance with the building standards or due to other defects in materials or workmanship not regulated by building standards.
(3) Ten years following the warranty commencement date, the home will be free from major structural defects due to noncompliance with the building standards or due to other defects in materials or workmanship not regulated by building standards.
Contrarily, generally, La.R.S. 9:2771 relieves a contractor of liability for defects in construction, if he builds the home according to the owner's plans and specifications. Notwithstanding, if the contractor knew or should have known of the defective specification, in order to escape liability, he had a duty to report the problem to the homeowner; if the homeowner instructs him to continue according to the plan, anyway, the contractor is immune from liability.[2] The statute provides that:
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration *14 or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
NHWA and La.R.S. 9:2771 govern and serve two important, but separate, situations and public policies. Thus, NHWA cannot preempt La.R.S. 9:2771, as the Thibodeauxs wish us to find. Moreover, to give the law that construction, essentially, would render La.R.S. 9:2771 moot, which we decline to do.
Next, they argue that, during the time relevant to this case, La.R.S. 9:2771 did not protect a "residential" building contractor because the statute simply referred to "contractors," and since the legislature amended it in May 31, 2001 to include "residential contractors," it could not have meant for residential contractors to be covered before the amendment. We find this argument to be specious.
In the statute, we must give the term, "contractor" its generally prevailing meaning.[3] Furthermore, the statute refers to "plans and specification," which are what a residential building contractor uses to construct a residence. Thus, given La.R.S. 9:2771's remedial purposes, at all times relevant to this case, as well as this statute's application to residential building contractors before the change to the statute,[4] we conclude that the legislature intended for "contractor" to encompass residential building contractors.
Alternatively, the Thibodeauxs claim that, even if La.R.S. 9:2771 does apply, Austin should not be immune, because, where the defects were obvious or easily cured, it should have exercised its discretion to deviate from the plans or specifications. For these propositions, they rely on American Eagle, Inc. v. Employer's Liab. Assurance Corp.[5] and Wilkinson v. Landreneau.[6]
We are unpersuaded that American Eagle would alter our decision. In that case, the court did not afford the contractor immunity under La.R.S. 9:2771 because it found that "the panels were improperly cut, the panels were visibly bowed and defective when they reached the job site and when they were installed, and the initial calking was improperly done." While the court is not explicit, the holding seems to imply, in part, that because the defects were discernible but the contractor used the materials anyway and, also, improperly installed the panels, it was not immune from liability. However, the trial court did not address the issue of blanket immunity or blanket liability, which the Thibodeauxs advance.
Furthermore, the Thibodeauxs cite Wilkinson[7] for the proposition that when a contractor deviates from the plans and specifications, in any regard, La.R.S. 9:2771 immunity is lost; that any deviation from the plans and specifications forfeits the contractor's La.R.S. 9:2771 benefits for the entire project. We do not find this to be the holding in Wilkinson. Contrarily, Wilkinson dealt with, only, one construction problemdefective construction of a chimneywhich the trial court deemed had to be torn down and rebuilt. While *15 there had been oral modifications to the plans, the court found the contractor to be liable because he had not followed the plans, which, presumably, caused the resulting irreparable problems. The court did not address La.R.S. 9:2771's effect when the contractor has plans but deviates from them for part, but not all, of the construction, as in the instant case. Thus, we find no support for strictly applying a blanket immunity or blanket liability when an owner provides a contractor with plans and specifications.
Notwithstanding, in the case at bar, it appears that the trial court granted Austin blanket immunity under La.R.S. 9:2771, because, originally, it was to build the house according to the Thibodeauxs' plans and specifications. We find no definitive case on this issue but believe that the broad brush strokes of, both, the trial court's and the Thibodeauxs' interpretations can lead to absurd results and unfairness, which the legislature could not have intended. Specifically, construction involves a multitude of tasks, which may or may not be interrelated. Thus, materials for and construction of some parts can be independent of others. Accordingly, it is logical that we must examine each construction item, regarding whether a defect in the plan or in the contractor's application of, or failure to apply, the plan caused the problem in order to determine whether immunity for that item is proper. Thus, since the trial court did not do this analysis, even though Austin deviated from the plans and specifications but, instead, afforded Austin a blanket immunity, we find legal error and conduct a de novo review[8] and analyze the instant case on an item-by-item basis.

BREACH OF CONTRACT/CANCELLATION OF CONTRACT
La.Civ.Code art. 2769 governs contracts to build. It provides: "If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract." Implicitly, every building contract requires that the work be performed in a good, workmanlike manner, free from defects in material and workmanship. Accordingly, jurisprudence dictates that a contractor is liable for damages if it is shown that he did not possess the necessary skill, efficiency or knowledge, or did not exercise ordinary care in performing work and is liable for losses, which the owner suffered because of the contractor's non-compliance with the contract.[9] Furthermore, even though a contractor must follow plans and/or specifications furnished to him, he can still be liable for damages if the destruction, deterioration, or defects were his fault and not related to the plans and/or specifications or if he had a justifiable reason to believe that adherence to the plans and/or specifications would create a hazardous condition.[10]
Our jurisprudence guides us in finding that a contract is the law between the parties.[11] In the instant case, initially, the Thibodeauxs allege that Austin failed to timely begin construction. Mr. Austin testified that he agreed to start the project *16 within fourteen days of the date of closing of the interim loan. In the middle of March, he received notice that the Thibodeauxs obtained the necessary financing. Subsequently, he received a check from them. Ultimately, the loan closed on March 18, 1991, and groundbreaking occurred on March 25, 1991, well within the fourteen day time period which the contract allocated. Therefore, we find that Austin did not breach the contract at this date.
Next, the homeowners assert that Austin did not work on sunny days and that Mr. Austin's failure to supervise, ultimately, delayed construction. It is unrefuted that Louisiana experienced significant rain fall during autumn of 1991. Naturally, construction did not advance at deliberate speed during the rainy season. In support of this contention, Mr. Austin and his experts testified that rain may cause significant delays in construction. For example, Mr. Cordelle Castette, Mr. Austin's brother-in-law, indicated that certain occasions may require waiting until the ground dries. However, the Thibodeauxs' experts refuted this testimony, stating that workers cannot be dismissed simply because of rain showers. Rather, they should sweep the water out of their way and continue working. Furthermore, had the home been expediently weatherproofed, Austin could have continued working inside on projects, such as plumbing and electrical work.
Because of Austin's failure to work whenever possible, the Thibodeauxs had multiple complaints. Consequently, they asked Mr. Caruthers, a Metro Code inspector, to examine their home for weather damage. He found many rotten items and stated "that this house was in such a dilapidated condition and extremely dangerous, and most of the material that had been exposed to weather over a period of time would have to be removed and replaced." Although these defects were sufficient to put Austin in breach of the contract, the Thibodeauxs' acceptance of its corrections, essentially, cured the breach.[12]
Additionally, the Thibodeauxs maintain that Austin did not supervise the home's construction; therefore, workmanship suffered. Mr. Austin testified that he entered into a political race which absorbed the majority of his time. Specifically, he admitted:
A. I placed myself up as a candidate for political office, and during that time I spent a great deal of time politicking and, therefore, not a great deal of time in my office.
And,
A. Well, one of the things I pointed out earlier in examination was that during the summer months I was involved in a political campaign that took me away from the office. We had some tremendously bad weather, both spring and summertime. We did have some problems with the construction plans, problems that needed to addressed. And we were slow.
Q. Because of the election campaign, that took a lot of your energies away from the building construction, because of the political implications?
A. Yes, it did.
Q. And you didn't give this house, perhaps, the attention you would have, had you not been running for office?

A. That's probably correct.

(Emphasis added.) Nevertheless, Mr. Austin acknowledged that he had promised the Thibodeauxs to make their house a priority, which he acknowledged that he did not do.
*17 Furthermore, Mr. Castette supervised the project during the political campaign. However, even he testified that Mr. Austin was not present as often as he would have liked, presumably, to direct the construction.
Finally, Mr. Thibodeaux stated that Mr. Austin was present at the job site, only, to ask for money.
Mr. Austin's failure to supervise construction directly correlates with the most significant issue with the homewater damage. The home suffered significant water leaks and resulting damage in the fireplace and balcony, as well as the wall in the breakfast area. The Metro Code inspector found that water had entered the home "through openings that had not been secured and/or stopped with plywood," as well as through the door, window openings, and through the felt on the roof.
The Thibodeauxs, Mr. Castette, Mr. Chatham, Mr. Hebert, and Mr. Austin, all, testified concerning the excessive water damage. Although Mr. Austin counters that the leak over the breakfast room resulted from design error, both, Mr. Chatham and Mr. Hebert believed that the lack of rain diverters over the entrances caused water to leak inside of the home. Mr. Chatham, also, stated that without building the cricket and flashes around the chimney, the chimney would leak. Notwithstanding, one year into construction, water still came into the house and exposed building materials to water damage.
Mr. Austin failed to prove that these leaks resulted from design errors and that, nevertheless, he provided good workmanship. Even Mr. Caruthers testified that "good workmanship practices requires that a contractor fulfill his obligation by blacking in a house as quickly as possible, especially when the weather conditions are inclement" Therefore, we find that Austin's substandard work caused excessive delays in weatherproofing the home, and its failure to expediently weatherproof the home constituted a lack of good workmanship and a breach of contract.
Moreover, Austin continuously substituted materials without the Thibodeauxs' consent. Mr. Austin readily admitted that it substituted waferboard for plywood. Although the material is economical, expert testimony established that waferboard absorbs moisture more than plywood. It harms the finish material that is put on top of it, affects the holding capacity of fasteners, and deteriorates faster. Additionally, Austin substituted the galvanized air-conditioning ducts with flex ducts, once again, without the Thibodeauxs' permission. Three witnesses, Mr. Hebert, Mr. Patin, and Mr. Navarre, all, indicated that it is not a good practice to substitute materials without the homeowner's or architect's authority.
The most blatant defect in Austin's substandard work involves the jacuzzi. Austin's subcontractors constructed and enclosed the jacuzzi foundation without water lines or a drain. Logically, the plumbing for the jacuzzi should have been installed prior to the installation of the jacuzzi's foundation, and common sense indicates that a jacuzzi cannot be used without water. Nevertheless, Austin argues that Mrs. Thibodeaux did not want decorative faucets, thereby, implying that since she did not want the faucets that she did not need a means to get water into the tub. On the other hand, she stated that, although she did not want decorative faucets, she, her husband, and Mr. Austin discussed where they could install a faucet and decided to put the cutoff valves under the vanity where the sink is located. Ultimately, Austin's failure to install water lines forced the Thibodeauxs to put a water *18 hose through the window to fill the jacuzzi with water.
All of the involved parties and experts involved admit that a jacuzzi is useless without water. However, Mr. Patin, one of Austin's experts, expects us to believe that since there were no provisions in the plans for attaching water or a drain, Austin was not responsible for installing them. We find this assertion to be ludicrous and without any merit.

DAMAGES

PECUNIARY LOSS
Understandably, the house's condition, before Austin corrected the problems, upset the Thibodeauxs and led them to withhold payment of $51,502.00 the December 26, 1991 draw. They defend their action by contending that Austin's work was substandard and that it was at fault for the leaking conditions around the chimney and near the breakfast room. We find Austin's failure to weatherproof the home to be substandard conduct and, therefore, hold Austin to be in breach of the contract.
Under La.Civ.Code art. 2769, the appropriate measure of damages, due to a breach of a contract to build, is what it will take to place the homeowner in the position he deserved to be in when the building was completed.[13] Accordingly, the owner is entitled to the cost of repairs necessary to convert the unsound structure to a sound one or the amount paid to remedy the defect.[14] However, the record does not provide us with detailed information regarding the amount which the Thibodeauxs expended to correct Austin's defective and substandard work. Therefore, we remand to the district court to determine this issue.

NONPECUNIARY LOSS
Damages for a nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.[15] Thus, if the obligee can show that he intended to gratify a significant nonpecuniary interest through the contract, the nature of the contract supports his contention, and the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, nonpecuniary damages may be recovered.[16]
There was much testimony, suggesting that the Thibodeauxs had commissioned this home for their intellectual satisfaction and enjoyment. However, their home was far from satisfactory or enjoyable. For example, the extensive water damage caused it to reek of mildew. Mrs. Thibodeaux and her step-daughter testified that the rotten smell was unbearable and that Mrs. Thibodeaux could not get rid of the odor. Mrs. Thibodeaux, also, complained about the resulting wind: "You'd have to leave the house open with the wind just constantly coming through, not to smell any odor."
*19 Mr. Thibodeaux noted that his wife was constantly burning candles to mask the odor, to no avail. His dream of a Georgian style home collapsed and a nightmare replaced it; specifically:
I was fascinated by the immense appearance of an authentic Georgian home, and at that time I had it in my heart to one day be able to afford that home.... It was always my dream to build this authentic Georgian home, and then I was happy because, in the meantime, I met Debbie, we got married, and then I was able to share this idea with another person.
And, Mrs. Thibodeaux added:
Q. Your dream house wasn't a dream house?
A. It was a nightmare.
. . . .
... I mean it was a happy time. I mean it was supposed to be a happy time, so we were real excited; so we wanted it from the groundbreaking on up. We didn't realize it would turn into a nightmare.
Mr. Austin confirmed that Mr. Thibodeaux had emphasized to him, on many occasions, how important having this Georgian style home was to him and the great trouble he had gone through to secure the plans. Mr. Austin said Mr. Thibodeaux would refer to them as "beautiful plans."
Mr. Thibodeaux, also, indicated that, because of all of the problems and disillusionment, his blood pressure escalated, which created a possibility for a stroke or heart attack, specifically:
A.... I went to the doctor's office and he told me, he said, "You're going to have to do something with your blood pressure."
Q. How high was it at this time?
A. When he checked it at that time it was two hundred and twenty over a hundred and ten (220/110). He says, "You're a good candidate for a heart attack."
Q. How high was your blood pressure before that, before the construction?
A. Well, it was under control. It was as low as one-forty over sixty or seventy (140/60, 70). Oftentimes it was one-twenty over sixty or seventy (120/60, 70), but with medication. But he doubled the medication, and it still wouldn't come down.
Mrs. Thibodeaux verified:
A. He had high blood pressure, but it was under control.
Q. And then after the house started being built what happened?
A. It wasI was really concerned about him, and he was, too. The doctor was trying to do everything to control it, and nothing could control it until he said, "You're going to have to get rid of the stress." And that was when we just couldn't take it anymore.
The Thibodeauxs testified that, ultimately, given the smell and all of the problems with this home, they could not live in it; they had to sell it. Mr. Thibodeaux explained:
I still had a problem because of the fact that I had this dream for so long. I had to extract it, and I had to think that I had to let it go, even if I didn't feel like it. But finally we moved, and very, very soon I made peace with that. And now, you know, it still haunts me.
Mrs. Thibodeaux lamented:
Q. Did you have towhy did you eventually sell this house?
A. I couldn't live in that house anymore.
Q. Why was that?
A. Just knowing what's behind the walls, the smell. I knew thatwell, at *20 that time, even, we needed some more tear down, and we could not ...
Q. You needed what?
A. We needed to tear down some more areas. We needed to get that rotten wood out and the smell. We had windows rotting. We had wood rotting. You could see the thingsyou could see the rot. And we knew there was major repairs, and we needed to do that.
One might wonder who would buy this house if it was so bad. They sold it to a contractor, who, presumably, could, economically, remedy the problems and resell it at a higher price than what he paid.
While the Thibodeauxs sold it for less than they paid to have it built, a realtor stated that the pecuniary loss was because the house was the largest in the neighborhood. Thus, we do not find that they suffered a pecuniary loss in the sale's price. However, we do find that they suffered a nonpecuniary loss and that Austin should have known that his failure to perform would cause it. Therefore, we award $5,000.00 to each of them for nonpecuniary damage.

TRIAL COURT'S AWARD
Additionally, alternatively, the Thibodeauxs argue that if the trial court's judgment is affirmed, its finding of $58,388.55 was wrong because Austin should have given them credit for their entire deposit ($38,150.00), not for just 59.7% of it. We agree that they should receive credit for their entire deposit.
Also, they request an award for the repair of Austin's defective work. However, they did not present evidence that all of the work that it performed, until March 24, 1992, was defective. Accordingly, under our analysis, Austin may be due compensation for work, which it properly performed. However, we are unable to discern from the record how much of its work required correction. Thus, we remand to the district court to determine this issue.

LOST PROFIT
La.Civ.Code art.1995 provides that the obligor is liable for lost profit on a contract, if he breaches it. However, since we find that the Thibodeauxs are not responsible for the breach; they had just cause for canceling the contract; therefore, they are not liable for Austin's lost profits. Accordingly, we find that Austin is not due any amount for lost profits.

SUBCONTRACTORS
Austin and the Thibodeauxs agreed to a $20,000.00 payment in February of 1992 and subsequent weekly payments. Austin worked until March 24, 1992. However, the Thibodeauxs paid, only, the $20,000.00. When they terminated the contract, it appeared as if the subcontractors were due payment. Nevertheless, the subcontractors continued construction on the house until its completion. Thus, the Thibodeauxs argue that they should receive a deduction for those payments, which they made directly to the subcontractors in June and July of 1992 and that a remand is necessary to quantify this offset. In effect, they are saying that, if Austin's award is upheld, they will have paid twiceonce to the subcontractors and once to Austinfor the same subcontractor work. We agree that if the Thibodeauxs made payments to subcontractors for work which they did during the time that the trial court awarded $58,388.55, they are due an offset. However, the record is unclear concerning how much was paid to the subcontractors and by whom the Thibodeauxs or Austinparticularly in January, February, and March of 1992, when Austin was still working. Thus, we *21 remand to the trial court for that determination.
In summary, Austin is to receive payment for the 59.7% of the construction, which it properly completed, minus what it should have paid the subcontractors through March 24, 1992 and offset by the amount, which the Thibodeauxs had to spend after its departure to correct its substandard work. Additionally, they are entitled to a credit for the entire deposit and all draws, which they gave Austin.

CONCLUSION
For the reasons above, we reverse, remand, and instruct the trial court to accept additional evidence and make the proper calculations in accordance with this opinion. Finally, we cast Austin with all appeal costs.
REVERSED AND REMANDED.
NOTES
[1] La.R.S. 9:3141.
[2] La.R.S. 9:2771; See Cormier v. Honiron Corp., 00-446 (La.App. 3 Cir. 9/27/00); 771 So.2d 193.
[3] La.Civ.Code art. 11.
[4] King Bros. Bldg. Contractors, Inc. v. McCullen, 393 So.2d 413 (La.App. 1 Cir.1980).
[5] 389 So.2d 1339 (La.App. 1 Cir.1980), writ denied, 396 So.2d 885 (La.1981).
[6] 525 So.2d 617 (La.App. 3 Cir.1988).
[7] 525 So.2d 617.
[8] Evans v. Lungrin, 97-541 (La.2/6/98); 708 So.2d 731; Harvey v. T.H.E. Ins. Co., 99-1440 (La.App. 3 Cir. 6/28/00); 764 So.2d 354.
[9] Cell-O-Mar, Inc. v. Gros, 479 So.2d 386 (La.App. 1 Cir.1985); writ denied, 481 So.2d 1333 (La.1986).
[10] Id.
[11] La.Civ.Code art. 2045.
[12] See Davidge v. H & H Construction Co., 432 So.2d 393 (La.App. 1st Cir.1983).
[13] Hageman v. Foreman, 539 So.2d 678 (La. App. 3 Cir.1989); Hebert v. McDaniel, 479 So.2d 1029 (La.App. 3 Cir.1985).
[14] Nicholson & Loup, Inc. v. Carl E. Woodward, Inc., 596 So.2d 374 (La.App. 4 Cir. 1992), citing Manzanares v. American Intern'l Forest Products, Inc., 389 So.2d 1142 (La.App. 3 Cir.1980).
[15] La.Civ.Code art. 1998. See Taylor v. Burton, 97-1348 (La.App. 3 Cir. 3/6/98), 708 So.2d 531; Mayerhofer v. Three R's Inc., 597 So.2d 151 (La.App. 3 Cir.1992).
[16] See Young v. Ford Motor Co., Inc., 595 So.2d 1123 (La.1992).