292 So.2d 345 (1974)
NICHOLS FORD COMPANY, INC., Plaintiff-Appellee,
v.
V. Linton HUGHES, Individually and doing business as Hughes Engineering and Construction Company and the Travelers Indemnity Company, Defendants-Appellants.
No. 12250.
Court of Appeal of Louisiana, Second Circuit.
March 19, 1974.
Wright & Joyce by Patrick H. Wright, Jr., Monroe, for defendant-appellant V. Linton Hughes, Individually and d/b/a Hughes Engineering and Construction Co.
Theus, Grisham, Davis & Leigh by R. L. Davis, Jr., Monroe, for defendant-appellant, The Travelers Indem. Co.
Hayes, Harkey, Smith & Cascio, by Thomas M. Hayes, Jr., Monroe, for appellee.
*346 Before AYRES, HALL and WILLIAMS, JJ.
HALL, Judge.
At issue in this appeal is whether the plaintiff-owner, Nichols Ford Company, Inc., is entitled to recover from the defendant-contractor, V. Linton Hughes, d/b/a Hughes Engineering and Construction Company, and his surety, The Travelers Indemnity Company, the cost of repairing or replacing an allegedly defective roof and concrete floor in a prefabricated steel building constructed by Hughes for Nichols, and, if so, the amount of recovery.
The district court, in a comprehensive written opinion reviewing the facts and applicable law, found the roof and the concrete floor to be defective. The court awarded plaintiff $2,000 for the cost of repairing leaks in the roof; $201.50 for the cost of replacing ceiling tiles damaged by water leaks; and $10,500 for the cost of tearing out and replacing part of the concrete floor of the building; or a total of $12,701.50, subject to credit of $3,795 still owed by plaintiff on the contract price. Defendants appealed. Plaintiff answered the appeal, praying for an increase in the amounts awarded. We affirm the judgment of the district court.
Applicable Law
There is little dispute as to the principles of law governing this case. It is implicit in every building contract that the work of the building be performed in a good, workmanlike manner, free from defects either in materials or workmanship. An owner seeking to recover from the contractor has the burden of proving both the existence and nature of the defects, that the defects are due to faulty materials or workmanship and the cost of repairing the defects. LSA-C.C. Arts. 2762 and 2769. See Rathe v. Maher, 184 So.2d 256 (La. App. 1st Cir. 1966) writ refused 249 La. 201, 186 So.2d 159 (1966).
The Roof
Plaintiff contends the metal roof has leaked continously from the time construction was completed in September, 1969, to the time of trial in October, 1972, and that since numerous attempts at repairs by the contractor have been unsuccessful, the entire roof should be replaced at an estimated cost of $17,490. Defendants contend plaintiff has failed to prove the roof is defective and that any leaks that exist can be repaired at a cost of not more than $1,000.
The testimony of plaintiff's president, Nichols, and several employees clearly establishes the roof has leaked at numerous and scattered locations throughout the building on a continuing basis since construction was completed. Complaints were made to the contractor who made several attempts to repair the leaks, but leaks continued to appear.
Plaintiff offered no evidence as to the nature and cause of the leaks in the roof. Two expert witnesses estimated the cost of repairing the roof at $14,175 and $15,900, respectively, but neither witness examined the roof to determine the nature of the defects or the necessity of replacing the entire roof. One of the witnesses did express the opinion in answer to a hypothetical question that if a roof leaked continuously for three years and all efforts to repair it failed, then a new roof was the only answer. However, the question asked and the opinion stated are too broad and general to have significant probative value as to the necessity of replacing this particular roof. Plaintiff offered no evidence of the cost of repairing, as distinguished from replacing, the roof.
Defendants' expert witnesses who examined the roof testified it appeared to be *347 properly constructed and in reasonably good condition. The thrust of their testimony was that the leaks could be repaired by locating the leaks with the cooperation of the owner, checking the roof in the area of the leaks for loose and stripped screws, tightening the loose screws and replacing the stripped screws with oversize screws, and caulking. One of the defendants' witnesses testified it might be necessary to replace some sheets of the metal roofing if the leaks could not be stopped in the manner described. One witness estimated the cost of repairs at $500 and another at $1,000, plus the cost of replacing any sheets if necessary.
The evidence does not establish the necessity of replacing the entire roof in order to correct the several leaks in it. The preponderance of the evidence is that the roof can be repaired. The only evidence as to the cost of repairing the roof is that presented by defendants. The district court awarded $2,000, in line with the highest estimate of defendants' witnesses considering the cost of additional material referred to by the witness and the increased cost of labor and material. The district court also awarded $201.50 for the cost of replacing ceiling tile damaged by water leaking through the roof. We find the awards to be fair and reasonable and in accord with the evidence.
The Concrete Floor
The building is composed of a service or shop area, parts area, office area and showroom. The controversy concerning the concrete floor relates to the service area on the east side of the building, and the parts area on the west side.
The plans and specifications called for five sack concrete with 6" × 6" Number 10 gauge mesh with a 4" slab in the service area and a 3" slab in the parts area. After completion of construction, several cracks and flaking or spalling developed in both areas. In an effort to partially remedy the situation an area approximately 30' × 12' in the service area was torn out and replaced by the contractor with a new slab which has remained in good condition.
Plaintiff contends the concrete floor in both the service area and parts area is defective due to poor workmanship or inferior materials and should be torn out and replaced with a new slab at an estimated cost of $28,517.50. Defendants contend any defects in the floor in the service area are due to use by heavy trucks and equipment on a slab of insufficient width, for which defendants are not responsible because Hughes recommended a 5" slab to Nichols but Nichols insisted on a 4" slab to save costs. Defendants further contend that any defects in either area can be repaired by using a sealing and hardening process at a cost of approximately $1,200.
The evidence clearly establishes the existence of several cracks in the concrete floor in both the service and parts areas, the worst cracking being in the parts area. Many of the cracks go all the way through the slab to the base material. They are significant to the extent that they are not only unsightly, but interfere with efficient use of the areas involved. The evidence further establishes that the surface of the concrete floor is flaking or spalling.
Plaintiff presented the testimony of two expert witnesses, Joe L. Davis, III and Whitfield Arnold, together with a report of tests made by Southwestern Testing Laboratories.
Davis is in the private practice of civil and structural engineering and has been so engaged since 1961. He graduated in 1948 from Louisiana State University with a Bachelor of Science degree in civil engineering and is a registered professional engineer in Louisiana, Arkansas and Texas. He has been qualified in several courts as an expert witness in the field of civil and structural engineering. He has extensive *348 experience in the designing and building of concrete slabs for commercial buildings.
Davis examined the slab in September, 1970. He found the slab was extensively cracked and there were sizeable areas of spalled concrete (where the top of the finish of the concrete was broken off showing a softer material underneath). The cracking was pronounced in the whole service or shop area, except for the area where the slab had been torn out and replaced. The cracking was also extensive in the parts area. There was a soft characteristic to the top of the concretethe top 1/8" could be flaked off easily. The slab exhibited characteristics normally associated with soil cement, that is, lack of strength, ability to dig out sand and gravel with little effort, and lack of abrasive resistence. This was primarily in the service or shop area.
Davis reviewed a report of Southwestern Testing Laboratories which tested six cores taken from the slab. The compressive strength per square inch ranged from 1708 to 2067, with an average of 1,928 pounds per square inch. Davis expressed the opinion that five sack concrete should have a compression strength of between 2,600 and 3,000 pounds per square inch.
Based on his investigation and the fact that the tests showed a strength below what would normally be expected, Davis concluded the lack of strength of the concrete was due to either lack of supporting cement or a retempering of the mix or excessive water added to the mix. He was of the opinion the defects were due to the insufficient strength of the concrete. Davis was of the opinion acceptable prevailing standards in the industry had not been adhered to and the requirements of the contract had not been met in the construction of the concrete slab.
The witness reexamined the slab shortly before trial in September, 1972. The concrete showed the same characteristics, there appeared to be more cracking than noted on the first inspection, and the spalling had continued.
Davis was of the opinion the obvious corrective measure would be the removal and replacement of the floor slabs. As an alternative, he suggested a new slab, separated from the old one by a sand cushion, be placed over the existing concrete. He was of the opinion the strength of the existing concrete is not sufficient to provide for the load involved if a thin topping were placed over the concrete. He stated that without correction, the slab will continue to crack and eventually there will be areas of concrete that will have no support surrounding them.
The witness Arnold had been in the construction business twenty or twenty-five years. Although he had no technical training or education related to concrete, he had many years of practical experience with concrete slabs, including design, pouring and curing.
Arnold inspected the slab in question and found many breaks and flaking. He described breaks as being a broken place in the floor as distinguished from a hairline crack. Flaking was described as chips coming out of the top of the floor, leaving an indentation, and as a condition not easily repaired. Arnold was of the opinion the cracks and breaking would continue to increase in the future and that the floor could not be repaired. He believed the solution was to replace the entire slab.
Arnold's opinion was that the use of a liquid sealer and hardener would not be a satisfactory solution in view of the present condition of the slab.
Another witness, Ernest Jack Green, who specializes in the construction of steel buildings, expressed no opinion on the condition of the slab or the necessity of replacing it, but did estimate the cost of replacing the slab in both the shop and parts areas at $25,925, plus ten per cent for increases in costs since his estimate was made in March, 1971.
*349 The defendant Hughes is a well-qualified engineer in addition to being an experienced contractor. He holds Bachelors and Masters degrees in civil engineering and had several years teaching experience in this field before going into the construction business. His testimony implies that he would attribute the problems in the shop area to the laying of a 4" slab with 10 gauge mesh as directed by the owner rather than a 5" slab with 6 gauge mesh as recommended by him. However, Hughes never directly expressed such an opinion nor did he express any opinion concerning the lack of strength of the concrete.
Hughes attributes the problems in the parts area to an unstable base resulting from the void under the old slab on which the new slab was laid. Hughes advised Nichols he would not guarantee the slab in the parts area unless the void was filled with sand or similar material, which Nichols would not authorize because of the additional cost.
Hughes was of the definite opinion that the sealer treatment would adequately seal and repair the cracks in both areas.
Another witness for defendants was Jack Parker Humble, Sr., who is in the readymix concrete business and who had been doing concrete work since his youth. He supplied the cement for the Nichols job. Humble expressed no opinion as to the cause of the cracks. The essence of his testimony is that the owner got the kind of slab he paid for. He testified the use of the sealer would fill the cracks, stop them from getting worse, and provide strength. He estimated the cost of this procedure at approximately $1,200.
The district court found it was conclusively proved that the slab was of low compressive strength and although there was some question as to whether the thickness of the slab contributed to the problems, the thickness had no bearing on the insufficient compressive strength. The district court concluded that the slab was defective, either in material or workmanship. The concrete was either inferior or it was not properly poured and cured.
The trial court further concluded that defendant Hughes did not guarantee the floor under the west side (parts area) of the building where the slab was poured over an old slab under which there was a three foot void and defendant is not responsible for the defective condition in that area. The court held plaintiff was entitled to a better floor then he got in the east half or shop area of the building.
The trial court was not convinced the sealer procedure would do the job and hold up and concluded plaintiff was entitled to recover the cost of replacing the floor in the shop area. Although that cost could not be calculated with mathematical precision on the basis of the evidence, the court arrived at $10,500 as a fair and equitable amount to be awarded.
We concur in the findings and award made by the district court. The strength of the concrete was not up to the standards contemplated by the contract requirements and the lack of strength was the major factor in the resulting cracks and flaking according to the weight of the evidence. Other factorsparticularly the instability of the base resulting from the void under the preexisting slab under the parts area, for which the contractor would not be responsiblemay have combined with the lack of strength to produce the total resulting defects. Although it is difficult to fix the exact amount which plaintiff should be allowed to recover under the evidence in the record, our conclusion is that the award made by the district court fairly compensates plaintiff for its loss and damage caused by faulty materials or workmanship.
For the reasons assigned, the judgment of the district court is affirmed, at appellant's cost.
Affirmed.