514 So.2d 707 (1987)
TEX-LA PROPERTIES, Plaintiff-Appellee,
v.
SOUTH STATE INSURANCE CO., et al., Defendants-Appellant-Appellee.
No. 19051-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1987.
Mayer, Smith & Roberts by Walter O. Hunter, Shreveport for South State Ins. Co.
Anderson and Holliday, by M.F. "Rick" Fayard, Jr., Bossier, for Tex-La.
Wilkinson, Carmody & Gilliam, by Jerald M. Jones, Shreveport, for Commercial Steel.
Before MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
MARVIN, Judge.
The insurer of a Bossier condominium development under an "all risks" policy appeals a judgment which upheld coverage and ordered the insurer to pay its insured, the development owner, $26,576 for the cost of replacing 61 metal carport canopies which collapsed during a snow and ice storm about a week before Christmas in 1983.
The insurer contends that the policy excludes coverage for loss the insurer contends was solely caused by "faulty design" of the carports by the Texas subcontractor who erected the carports for the owner-general contractor of the development. Alternatively, the insurer contends that if the policy is construed as covering the risk, it should have judgment on its cross-claim demand against the carport subcontractor whose alleged faulty design caused the carports to collapse during the snow and ice storm.
The insurer also asks in the further alternative that we amend the judgment to apply the deductible ($1,000 maximum) provided by the policy (Conditions, Section 1, par. 2(b)).
We amend to apply the deductible and shall otherwise affirm the judgment.

FACTS
The general contractor for the construction of the condominiums was the owner. The owner desired cantilever-type carports *708 which were widely employed in the Dallas-San Antonio areas in Texas. The owner's construction consultant in San Antonio had used the cantilever carports on a project in San Antonio and had recommended the Texas subcontractor and that type carport to the owner. Cantilever carports do not have cornerposts and are less susceptible to being damaged by automobiles that park under them.
After talking with the owner's consultant, the owner's vice-president and project manager for the construction, McDaniel, discussed and described the design of the San Antonio-type carports desired by the general contractor with the Texas carport subcontractor's sales manager, Plunkett. Plunkett submitted a detailed drawing and written proposal to erect the cantilever carport desired by the general contractor. After some negotiated changes that increased the depth of the carport to cover a storage shed, the subcontractor then submitted a written cost proposal and drawing which was eventually accepted and became the contract. Testimony indicated that cost proposals made by Louisiana carport subcontractors to the general contractor were higher.
The only building permit procured for the project from Bossier City regulatory authority was procured by the general contractor. A building permit for the carports was not discussed or sought by either the general contractor or the subcontractor.
In addition to dimensions, painting, and concrete foundation requirements, the proposal and drawing of the Texas subcontractor that was accepted required that the carports be constructed of steel 14 gauge boxed columns, fascia, and tapered headers, and 29 gauge decking. McDaniel signed the proposal for the owner-general contractor under these words of "Acceptance:"
The above prices, specifications and conditions are satisfactory and are hereby "accepted."
McDaniel acknowledged his acceptance for the owner but attempted to explain that he approved the "design" and not the "specifications," by stating that "I have no basic knowledge of steel construction ... I'm not an engineer." Before the "acceptance" was signed, however, McDaniel exhibited the proposal and the drawing to, and discussed it with, one of the owner-general contractor's building superintendents who had a college degree in "Building Construction."
Shortly after the carports collapsed, the accumulation of ice (1") and snow (3") was measured. The only civil engineer-structural expert to testify stated that the carport was not able to withstand the additional 8 lbs. per square foot calculated weight of the ice and snow. He testified that the steel used in the construction and the configuration of the structure did not provide sufficient structural rigidity and "that [the absence of rigidity], in combination with [the weight of the accumulated snow and ice], caused the [carports] to fall." The expert said that he could not have evaluated the strength of the structure solely from the contract drawing.
The carport subcontractor had built over 200,000 carports in Texas and Oklahoma. This was that subcontractor's first undertaking in Louisiana. The record reveals that a proposal by one Louisiana carport subcontractor to the owner included the printed representation that the carport would be built "consistent with trade standards." The quoted phrase was understood by McDaniel to mean consistent with building code requirements for the area in which the construction would be done. The Texas subcontractor's proposal did not contain such a representation.
The structural expert witness said that if the carports had been built in accordance with the Bossier Building Code they would not have collapsed under the weight of the ice and snow. The record does not contain, however, any building code standards, whether in Louisiana, Texas, or Oklahoma, or expert testimony explaining how such standards may vary from place to place.
The owner-general contractor, through McDaniel, accepted and paid for the carports six months or more before they collapsed in December. The trial court concluded that the owner-building contractor *709 was an "active participant during every stage at which design and specifications [for the carports] were being formulated." The trial court also concluded that the owner-building contractor "had seen [the Texas sub contractor's] canopies in the San Antonio area and wanted [and, we add, effectively `bargained for'] similar ones." The trial court's ultimate conclusion in this respect in written reasons for judgment was:
... McDaniel was aware of the design and specifications from which the canopies would be constructed. He ... personally looked over the design, submitted it to his building foreman, who apparently approved it, and then, once the canopies were built, agreed that they were what he desired. He did not submit the plans for the [canopies] to the local building inspector.
Our factual review of the record in the light that most favorably supports the judgment leads us to find that the trial court's factual conclusions are supported by the record and are not clearly wrong.

LIABILITY OF SUB-CONTRACTOR
The broad standard for imposing liability under a building contract has been stated:
... a builder is obliged to construct work that is suited for its intended purpose. Stated another way, it is implicit in every building contract that the work will be performed in a good, workmanlike manner free from any defects in materials or workmanship. Don Siebarth Pontiac v. Asphalt Road Bldg., 407 So.2d 42, 45 (La.App. 3d Cir.1981)
See also LSA-C.C. Arts. 2762, 2769; Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App. 2d Cir.1974); Wetmore v. Blueridge, Inc., 391 So.2d 951 (La.App. 4th Cir.1980).
La.R.S. 9:2771 creates an exception to the general standard in this language:
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. (Emphasis added.)
Although the trial court did not specifically refer to the quoted statutory exception, it emphasized its finding that the owner-building contractor was actively involved in formulating the design and specifications for the carport canopies. Any statutory exception ordinarily is strictly construed. American Waste & Pollution v. Madison Parish, 488 So.2d 940 (La. 1986). The circumstances of this record do not fall squarely within the general liability standard [that the carport be suited for its intended purpose] or within the statutory exception [that specifications for the carport were furnished to the contractor and were not made or caused to be made by that contractor].
Liability is not imposed on the subcontractor in these circumstances because both the contractor and the subcontractor held relatively equal positions, both were engaged in construction, and both "actively engaged" in the design specifications of the carport. The general contractor sought a particular carport, told the subcontractor what it desired, exhibited the later-submitted specifications [which included dimensions and gauges of the steel] to a supervisory employee with a degree in building construction, and formally "accepted" the "specifications."
Additionally, the general contractor is shown to have had the benefit of at least two proposals, only one of which was understood by the contractor to require that the carport be constructed according to the Bossier Building Code standards. That proposal was higher in cost than the one accepted.
Under these circumstances, we must agree with the trial court that the general contractor knew what it was bargaining for and did not intend that the subcontractor would erect a carport of stronger gauge steel which, according to its expert, would comply with the local building code. We cannot find that the carport constructed *710 complied with the San Antonio building code because no evidence is in this record in that respect.
Intent, as a fact, is an issue to be inferred from the circumstances of each case, and we may not substitute our judgment on the obvious inference of the trial court, especially where the record supports the facts upon which the inference is based. Kuswa & Associates v. Thibaut Const. Co., 463 So.2d 1264 (La.1985). The trial court's denial of the insurer's cross-claim against the subcontractor is affirmed.

THE POLICY EXCLUSION
The insurer contends that this exclusion precludes coverage:
This policy does not insure under this form against
E. Loss caused by:
9. faulty design, specifications, workmanship, construction, or materials if a peril by this policy contributes to the loss at any time [sic]
The insured contends that the emphasized phrase of the exclusion could mean either a "peril [covered] by" the policy or a "peril [otherwise excluded ] by" the policy. We agree. The latter interpretation favors the insured because the litigants agree that damage from snow and ice is not otherwise excluded from the policy. The insured, of course, contends the exclusion, in any event, is vague and, having been written by the insurer, must be interpreted in favor of the insured and against the insurer. Again we agree.
It is not necessary for us to consider the finding of the trial court that the prerequisite for the application of the quoted exclusion"faulty design [or] specifications," was not proved.
The issue of negligent or faulty design should not control the construction of the ambiguous exclusion clause. We assume, as the sole expert ultimately concluded, that the collapse of the canopies was caused both by the lack of rigidity or strength of the steel used and by the weight of the snow and ice.
The exclusion clause is ambiguous because of the language we have emphasized. The exclusion, as we have said, could mean either of two things. If the loss, whether in whole or in part, was caused by ice and snow, the policy insured against that loss. Limitations upon coverage must be "clear and express in order to inform the insured that he must take special measures to obtain protection." Aetna Ins. Co. v. Emmons, 348 So.2d 1267, 1270 (La.App. 4th Cir.1977). An insurance policy must be read broadly in favor of coverage it purports to provide. Hebert v. First American Ins. Co., 461 So.2d 1141 (La.App. 5th Cir.1984), writ denied. This policy purported to provide coverage against damage or loss from ice and snow.
The exclusion relied on is patently ambiguous and cannot be read to preclude coverage under the recited circumstances.

THE DEDUCTIBLE
We agree with the insurer's contention that the trial court should have applied the deductible provided in the policy. From the record, we deduce that this oversight was not called to the trial court's attention. The policy applies a $100 deductible "separately to each building", up to a maximum of $1,000. More than 10 canopies were destroyed. The maximum $1,000 deductible is applicable.

DECREE
For the above reasons, we amend to reduce the judgment by applying the deductible of $1,000, reducing the award to $25,576. As amended, the judgment, at appellant's cost, is AFFIRMED.