997 So.2d 734 (2008)
REGIONS BANK, Plaintiff-Appellee
v.
ARK-LA-TEX WATER GARDENS, L.L.C. and John Troy Cash, Jr., Defendants-Appellants.
No. 43,604-CA.
Court of Appeal of Louisiana, Second Circuit.
November 5, 2008.
Rehearing Denied November 25, 2008.
*735 Ray C. Mayo, Jr., for Appellant.
Glenn L. Langley, Shreveport, for Appellee.
Before WILLIAMS, GASKINS and CARAWAY, JJ.
WILLIAMS, J.
The defendants, Ark-La-Tex Water Gardens, L.L.C. and John Cash, Jr., appeal a judgment in favor of the plaintiff, Regions Bank. The trial court awarded damages of $202,878.05 to plaintiff, finding that the defendants failed to complete the contractual obligation in a timely and satisfactory manner. For the following reasons, we amend and affirm as amended.

*736 FACTS
In the summer of 2004, Lewis Norton, who was chairman of the board of directors of the R.W. Norton Art Foundation, contacted John Cash to discuss construction of a water feature on the grounds of the R.W. Norton Art Gallery, which is located in Shreveport and owned by the foundation. Norton had read a magazine article discussing a water feature installed by Cash at a private residence. After visiting the gallery site, Cash presented a drawing depicting a tiered feature with water flowing 35 feet downhill into a holding pond. At the time, Norton approved the plan.
In December 2004, the parties entered into a contract for construction of a water feature by Ark-La-Tex Water Gardens, L.L.C. ("Ark-La-Tex") for a price of $292,616 to be paid in three installments. The contract provided that work would commence in January 2005 and be "substantially completed on or before March 31, 2005. Time is of the essence." The timing was important because of the azalea blooming season, which was a popular public attraction at the art gallery.
During construction, Norton told Cash about problems with workers trampling the azalea bushes and with construction delays after the supervisor, Mike Allen, quit the job in the first month. Ark-La-Tex failed to complete the work by March 31, 2005, as required in the contract. However, Norton allowed Cash additional time to finish the project. The water feature was substantially completed and activated in July 2005, when Ark-La-Tex received the final payment of the total $292,616 price.
A short time later, Norton complained that the water level in the lower pond was dropping approximately two inches daily and that the water flow rate was inadequate to carry leaves and debris down through the system. Cash was called to the site numerous times to address these problems and he adjusted areas where water was spilling over the liner, but he was unable to stop the water loss or improve the flow rate to Norton's satisfaction. In January 2006, Norton discharged Cash after he failed to appear at the site as promised to resolve the continuing problems with the liner in the lower pond.
Norton then consulted Mike Spencer, who was employed by Backyard Superstore, L.L.C. ("Backyard"). Spencer evaluated the water feature and suggested several modifications to correct the problems with the system. Norton then hired Backyard, which took apart and rebuilt the water feature. Norton paid a total of $202,878.05 for the renovation.
Subsequently, the plaintiff, Regions Bank, the trustee of the R.W. Norton Art Foundation, filed a petition for damages against the defendants, Ark-La-Tex and John Cash, Jr., individually, alleging breach of the contract due to defective performance and breach of Cash's professional duty. After a bench trial, the court found that Cash failed to complete his obligation in a timely and satisfactory manner, requiring the plaintiff to hire a third party to rebuild a substantial part of the construction. The court further found that Ark-La-Tex was an alter ego of Cash, making him personally liable for the plaintiff's damages. The trial court rendered judgment awarding damages in the amount of $202,878.05. Defendants appeal the judgment.

DISCUSSION
The defendants contend the trial court erred in its application of law to the facts of this case. Defendants argue that they are not liable under LSA-C.C. art. 2769 because the plaintiff failed to prove that the water loss and flow rate problems *737 were defects caused by faulty workmanship.
When a party fails to do the work he has contracted to perform, or does not execute it in the manner and at the time agreed, he shall be liable in damages for the losses that ensue from noncompliance with the contract. LSA-C.C. art. 2769. In order to recover damages from a contractor for defective workmanship, the landowner must establish: (1) that defects exist, (2) that faulty materials or workmanship caused the defects, and (3) the cost of repairing the defects. Industrial Roofing & Sheet Metal Works, Inc. v. Dellinger Memorial Trust, 32,048 (La.App. 2d Cir.8/20/99), 751 So.2d 928, writs denied, 99-2948, 99-2958 (La.12/17/99), 752 So.2d 166; Nichols Ford Co., Inc. v. Hughes, 292 So.2d 345 (La.App. 2d Cir. 1974).
LSA-C.C. art. 1994 provides that an obligor is liable for the damages caused by his failure to perform a conventional obligation as a result of nonperformance, defective performance or delay in performance. Damages are measured by the loss sustained by the obligee. LSA-C.C. art. 1995. A trial court's factual findings will not be reversed unless clearly wrong. A reviewing court must determine whether the factfinder's conclusions were reasonable based upon the entire record. Stobart v. State DOTD, 617 So.2d 880 (La. 1993).
In the present case, Louis Norton testified that he and John Cash signed a contract in December 2004 providing that Ark-La-Tex would build a water pond feature at the Norton Art Gallery for a price of $292,616. Norton stated that Cash agreed to finish the project within 90 days in time for the blooming of the azalea plants. Norton testified that he looked at two other water features built by Cash that were much smaller than the one proposed for the gallery. Norton stated that Cash represented he could build the significantly larger pond feature even though he had not previously built a project of that size. Norton testified that Cash failed to complete the project by the contract deadline, but he was given additional time and the water feature was activated in July 2005.
Norton stated that a short time later he noticed that the water level in the lower pond was dropping one to one-and-one-half inches daily, indicating that the pond was losing hundreds of gallons of water each day. Norton testified that Cash believed that the water loss was likely due to evaporation and that Cash was unable to find any leaks. Norton stated that another problem was that although he liked the sound of the water flowing down to the pond he was not satisfied with the flow rate, which was not adequate to clear fallen leaves from the water surface. Norton testified that there were ongoing problems with water splashing over the unsecured liner in the stream area and with the liner in the lower pond repeatedly sliding into the water. Norton stated that in response to his complaints Cash and his workers regularly went to the site, but they were unable to repair the problems of water loss and insufficient flow rate. Norton testified that in January 2006 he spoke with Cash, who promised that the problems would be repaired the next day. Norton stated that when the workers did not show up as promised he fired Cash from the job.
Norton explained that he then signed a contract hiring Backyard to repair the cause of the water loss and improve the water flow rate. Norton testified that Backyard workers drained the water, removed the rocks and pumps and pulled up the liner. Norton stated that he was able to observe numerous cuts and perforations in the liner. Norton testified that Backyard *738 replaced the liner and improved the water flow by using a greater number of smaller pumps at three stages to circulate the water uphill from the lower pond, instead of pumping the water directly to the top as Cash had done. Norton stated that the water level in the pond did not drop after Backyard replaced the liner.
At trial, John Cash testified that he had never previously attempted to build a water pond feature of the same size or vertical height as the project at the art gallery. Cash stated that he was a licensed horticulturist, landscape contractor and irrigator, without any formal training in hydrology or hydraulics. Cash testified that in deciding which size pumps and pipe to use for the project he asked the opinion of the vendors and suppliers of the materials. Cash stated that he installed industrial sized pumps with cast iron bodies that were necessary to keep the water circulating throughout the system. Cash testified that when the water feature was activated in July 2005 he received the final payment from Norton, who said at the time that he liked the sound of the streams running downhill and the overall appearance of the pond feature.
Cash stated that in September 2005 Norton complained about water loss from the system as reflected by the dropping water level in the lower pond. Cash explained that he checked for a leak in the lower pond by shutting off the system to see if the water drained out. The water maintained its level, indicating to Cash that the liner did not have a leak. Cash then repeated the process for each of the system's two streams and did not find any evidence of a leak. Cash stated that in January 2006, he found several places losing water in the berm area and that those problems were repaired, so that he thought all of the sources of water loss not due to evaporation had been found. Cash acknowledged that although he had never seen any indication of a hole in the lower pond's liner, he had not drained the water and removed the rock to inspect the liner for holes or cuts. Cash stated that a certain amount of water would be lost from evaporation and splashing.
Regarding the issue of flow rate, Cash testified that the circulating water was never meant to remove all leaves from the system and that the skimmers he had installed performed their primary function of protecting the pumps. He stated that fallen leaves are a maintenance issue in any outdoor water feature and must be collected from the water with a net. Cash acknowledged that when he was discharged by Norton in January 2006, adjustments were still necessary to address two problems with the water feature. He stated repairs were needed to prevent the liner in the lower pond from slipping down into the water and to raise part of the liner along a stream above the water surface. Cash testified that even with these problems he did not see the need to take apart and substantially rebuild the entire water feature.
The trial court found that defendants breached the contract in failing to complete the project by the date specified and in constructing a feature with continuing problems of water loss and inadequate flow rate. Regarding the issue of water loss, the trial testimony demonstrated that after activation the pond feature continued to leak hundreds of gallons of water on a regular basis and that Cash was unable to completely repair the problem. Cash did not dispute the fact that when he was terminated one year after work had begun, repairs remained to be done in at least two areas of the feature where the liner was slipping. Although Cash said he never saw any holes in the liner, he did not drain the water and inspect the liner itself. In *739 contrast, Norton stated that when Backyard removed the water and rock, numerous holes were visible in the liner and that the water loss stopped after the liner was replaced. Based on the evidence presented, the trial court reasonably could have found that the continuing loss of a significant amount of water was a defect in the construction caused by Cash's faulty workmanship.
Concerning the issue of flow rate, Norton testified that over time floating solid material settled to the bottom of the very large skimmers used by Cash. Norton stated that when the skimmers were removed, he observed that each skimmer contained six inches of sludge that had required the pump to work harder and diminished the water flow. Norton complained that the skimmers installed by Cash did not have check valves to prevent water from flowing back into the pump if power was lost. In addition, Norton testified that Cash's use of two-inch PVC pipe and 90-degree fittings throughout the system significantly restricted the flow of water. Norton stated that Backyard's repairs improved the water flow by using smaller skimmers with check valves and filter baskets, installing three-inch pipe and removing most of the 90-degree fittings. Norton testified that after Backyard's repair work, the flow rate of the water feature was acceptable.
The evidence presented supports a finding that the water circulation system installed by Cash was deficient because the inadequate size of the pipe restricted the water flow, placing undue stress on the pumps, and because the large pumps and custom-made skimmers would be more costly to service or replace than the available alternative of smaller, standard-sized skimmers and pumps. After reviewing this record, we cannot say the trial court was clearly wrong in finding that Cash failed to satisfactorily complete the construction in compliance with the contract between the parties.

Repair Costs
The defendants argue that the damage award was excessive because the plaintiff failed to prove that the full amount of repair costs was reasonably necessary. For the breach of a building contract under Article 2769, the appropriate measure of damages is the cost of repairing any defects or of completing the work. Mount Mariah Baptist Church, Inc. v. Pannell's Assoc. Electric, Inc., 36,361 (La.App. 2d Cir.12/20/02), 835 So.2d 880, writ denied, 03-0555 (La.5/2/03), 842 So.2d 1101. The plaintiff has the burden of proving each element of his claim by a preponderance of the evidence. Industrial Roofing, supra. The standard of review for a damage award for breach of contract is whether the trial court abused its discretion. Mount Mariah Baptist Church, supra.
In this case, the plaintiff introduced into evidence an exhibit listing the payments to Backyard and its subcontractor, Waterlilies & Landscapes, for the repair work. The exhibit included the prices of material and equipment charged by Backyard. Based upon the evidence presented, we conclude that plaintiff failed to demonstrate the connection between the cost of some items and the repair of the defects of water loss and inadequate flow rate.
The costs listed included $720 for "barley bails," $6,608 for "boulders" and "lava rock" and $2,500 for "marginal water plants." The plaintiff did not demonstrate that rocks and plants different from those originally used were necessary to the operation of the water feature and these amounts shall be deducted from the damage award. Regarding the cost of $5,000 for "travel/lodging," we note that there *740 was no testimony to support a finding that this expense was reasonably related to the repair of the water feature. Additionally, the evidence submitted by plaintiff includes a document titled "Payments to Waterlilies & Landscape" with an entry dated 10/3/06, listing the amount paid as "final payment for pond and waterfalls project." However, another entry dated 12/19/06 lists a subsequent payment of $790 for installation of filter mats. The testimony failed to establish that this cost, which was made after the designated "final" payment, was actually necessary to the repair work. After reviewing the record, we conclude that the trial court abused its discretion in including the above amounts in the award of damages. Accordingly, we shall reduce the damage award by the amount of $15,618.

Personal Liability of Cash
The defendants contend the trial court erred in finding Cash personally liable for plaintiff's damages. Defendants argue that the plaintiff failed to prove that Cash was professionally negligent in building the water feature.
LSA-R.S. 12:1320(B) provides that except as otherwise set forth in the law, no member, manager, employee or agent of a limited liability company is liable in such capacity for a debt, obligation or liability of the limited liability company. This provision shall not be construed as being in derogation of any rights which a person may by law have against a member, manager, employee or agent of a limited liability company because of any breach of professional duty or other negligent act by such person. LSA-R.S. 12:1320(D). Thus, members of a limited liability company generally may not be assessed with personal liability for the debts and obligations of their limited liability company to third parties, unless there is proof of negligence or wrongful conduct by that person. Petch v. Humble, 41,301 (La.App. 2d Cir.8/23/06), 939 So.2d 499, writ denied, 06-2482 (La.12/15/06), 945 So.2d 692. To encourage commerce, the legislature has limited personal liability for some debts incurred or acts performed on behalf of business entities. However, this statute was not intended to shield professionals from liability for personal negligence. W.J. Spano Company, Inc. v. Mitchell, 05-2115 (La.App. 1st Cir.9/15/06), 943 So.2d 1131.
In the present case, the petition alleged that Cash was liable individually because he was negligent in designing and installing the water feature. In his brief, Cash argues that the evidence was insufficient to find him professionally negligent because there was no expert testimony to establish the industry standard for the construction of water features. However, in acting to build the water feature Cash implicitly promised that the work would be free from defects and performed in a workmanlike manner. See Mount Mariah Baptist Church, supra. As previously noted, the record shows that the water feature was defective due to faulty workmanship and materials. Thus, as the trial court found, Cash was negligent in constructing the water feature without the necessary skill and knowledge required for a project of that size. Based upon the evidence presented, expert testimony was not necessary to prove negligence.
In addition, the record demonstrates that Cash was engaged in his profession while building the water feature and was not acting solely in his capacity as a member of the limited liability company. Thus, pursuant to Section 1320(D), Cash was subject to personal liability arising from his own negligence in performing the construction. Consequently, *741 we cannot say the trial court erred in concluding that Cash was personally liable for plaintiff's damages under the circumstances of this case. The assignment of error lacks merit. In concluding that Cash's negligence was the basis of his personal liability, we pretermit a discussion of the defendants' remaining assignments of error concerning the admissibility of evidence about the defendants' financial activities for purposes of piercing the limited liability veil and the issue of whether Ark-La-Tex was the alter ego of Cash.

CONCLUSION
For the foregoing reasons, the trial court's judgment is amended to reduce the damage award, and we hereby award the plaintiff damages in the amount of $187,260.05. The judgment is otherwise affirmed. Costs of this appeal are assessed to the appellants, Ark-La-Tex Water Gardens, L.L.C. and John Cash, Jr.
AMENDED AND AFFIRMED AS AMENDED.
CARAWAY, J., concurs in part and dissents in part with written reasons.
CARAWAY, J., concurring in part and dissenting in part.
I concur in the determination of liability for the limited liability company ("LLC"), Ark-La-Tex, and the reduction in the award for damages. I respectfully dissent in the assessment of personal liability on the manager and member of the LLC.
In this case, the majority has correctly determined a breach of contract claim against Ark-La-Tex for a routine construction contract (or contract for work by the job, La. C.C. arts. 2756, et seq.), involving the delivery of services and certain components and products incorporated into the water project. There was a specific written contract naming as parties only the plaintiff and Ark-La-Tex. Plaintiff's payment of the price of the contract was by check to Ark-La-Tex. Nevertheless, the majority has additionally found tort liability against the owner/manager of an LLC for the breach of professional duties. In so holding, it has not only infused a personal tort duty into a commercial transaction which the parties understood as governed by their predominant contractual duties; it has taken the limited liability corporate shield principle of our LLC law under La. R.S. 12:1320 and allowed it to be swallowed up by the narrow professional duty exception also contained in that statute. As a result, every owner of a trade services business that conducts his trade through a separate LLC entity will no longer be shielded from personal liability for his company's negligent performance of its contracts.
With the enactment of Louisiana's statutory provisions for the LLC, a basic definition for the term, "business," was included in La. R.S. 12:1301(A)(2). Business was defined as "any trade, occupation, profession, or other commercial activity engaged in for gain, profit or livelihood." The definition has significance in the present context because of the distinctions between the various pursuits for a livelihood all expressed disjunctively in the listing. Mr. Cash in this case worked clearly in a trade business as opposed to what would be generally understood as a profession.
Next, Section 1320 of the LLC law provides the essential "limited liability" feature of this business entity, as follows:
... no member, manager, employee or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company"
*742 La. R.S. 12:1320(B). Like the liability shield provided managers, directors and shareholders of a corporation, this limited liability protection is central to the purpose of Louisiana's creation of the relatively new LLC business entity. Likewise, a manager/member/co-owner of an LLC engaged in the business and sharing profits with his non-managerial members should enjoy the same "limited liability" as other members from claims against the LLC on contracts involving the poor workmanship of the business.
With this central purpose for the LLC and the act's distinction between professions and trades, the exception to the liability shield set forth in subpart D of Section 1320 should not destroy the rule for every member/manager of the LLC who is engaged in the performance of the LLC's contractual duties. The exception states, in pertinent part:
Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company ... because of any breach of professional duty or other negligent or wrongful act by such person....
La. R.S. 12:1320(D).
The majority holds that it was Cash's negligence in tort that caused this water project to fail. It also holds that Cash was a professional. The weakness of both determinations can be seen in the facts concerning the water project's failure. Part of the problem with the project was caused by a defective water liner that apparently leaked. The source of the leak which was not pinpointed by the evidence may have been the product itself or the installation of the liner. If one of the Ark-La-Tex employees "negligently" damaged the liner as it was installed, we would not generally consider that the employee had breached a personal duty in tort owed directly to the plaintiff. There was no personal injury. Likewise, Cash's "negligent" supervision of the employee during the installation of the liner would not be an independent tort committed against the plaintiff. Both the employee and Cash performed their duties to Ark-La-Tex. Cash owed to plaintiff no duty which a court may consider as personal and delictual thereby transforming this commercial transaction and the law of contract into tort. It was the separate LLC entity that owed a contractual duty of sufficient performance to the plaintiff. On the contrary, if Cash or the employee negligently cause an automobile accident while in the course and scope of the business of Ark-La-Tex, either of them would be personally liable in tort for the accident while Ark-La-Tex would incur vicarious liability to the injured party. Such injured party would have no contract with Ark-La-Tex. The employee or Cash would enjoy no shield from liability. It is this distinction which the majority first misses when it holds that Cash owed a duty in tort for what was clearly the contractual undertaking of Ark-La-Tex. Negligent performance of a contract or poor workmanship by a business entity is not a tort which makes all the employee/manager actors of the business guilty of tortious conduct and personally liable.
With this distinction, therefore, the meaning of subpart D of Section 1320 can be understood. The "negligent or wrongful act" by a member/manager of an LLC which produces personal liability directly to an injured party must be such conduct in the course and scope of the LLC's business that would make the member/manager responsible in tort.
For the same reason and more, Cash did not "breach" a "professional duty" owed directly to the plaintiff. He only failed to carry out (or have other employees carry *743 out) the contractual duty owed by Ark-La-Tex. It was the LLC's contractual obligation. Therefore, the shield of subpart B of Section 1320, the central purpose for an LLC, applies. Moreover, Cash was not a professional, like a lawyer or doctor whose professions mandate direct duties to clients which cannot be shielded by a business entity. His work was a trade business which our LLC act clearly distinguishes from a profession.
The LLC business entity which is a new creation of our law is named "limited liability" for an important purpose. Third parties dealing with such entity do not enjoy the insurance of performance from the members of the company because those members are not personally liable for the LLC's contracts. The same holds true for a member manager who acts as the LLC's agent to supervise and render the contractual performance. With the lack of jurisprudence interpreting Section 1320 of the act, the present ruling strips away the intended protection of the law.
APPLICATION FOR REHEARING
Before WILLIAMS, GASKINS, CARAWAY, DREW and LOLLEY, JJ.
Rehearing denied.
CARAWAY, J., would grant rehearing.