640 So.2d 694 (1994)
Dalbert BERNARD, etc., Plaintiffs-Appellees,
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF (HIGHWAYS) TRANSPORTATION & DEVELOPMENT, etc., Defendant-Appellant.
No. 93-1376.
Court of Appeal of Louisiana, Third Circuit.
June 1, 1994.
Writ Denied October 14, 1994.
*696 Lawrence K. Burleigh, Joseph Roussel Streva Jr., Lafayette, for Dalbert Bernard.
Barry Gerard Toups, Baton Rouge, for State, DOTD.
Robert Murray Mahony, Lafayette, for Louisiana Paving.
Peggy Dean St. John, Henry B. Bruser III, Alexandria, for Crager Indus.
Christopher Richard Philipp, Lafayette, for Barber Bros.
Before GUIDRY, C.J., and YELVERTON and WOODARD, JJ.
YELVERTON, Judge.
This appeal is from a judgment awarding damages to Dalbert Bernard for personal injuries caused by the fault of the State of Louisiana, through the Department of Transportation and Development (DOTD), in a one-vehicle accident which happened during the construction of a highway project. The accident happened on June 7, 1980 when the law provided that contributory negligence barred a plaintiff's recovery. The DOTD appealed. The assignments of error are that the trial judge was wrong in finding no contributory negligence on the part of Dalbert Bernard; that the trial judge improperly excluded the results of a blood alcohol test; and that the trial judge erred in finding the contractor on this highway project, Barber Brothers Contracting Company, not liable for contractual indemnity or contribution. We find no error, and affirm the judgment in all respects.

FACTS & DOTD'S LIABILITY
Bernard was traveling south in a 1978 Ford pickup truck around 8:30 p.m. Barber Brothers had contracted with the DOTD to overlay the southbound and northbound lanes.
For a recitation of the salient facts and the reasons for imposing liability on the DOTD (its liability is not disputed on appeal), we will adopt the following pertinent findings of the trial judge:
This cause of action involves a one car traffic accident, which occurred on Louisiana Highway 167 at the Moss Street extension crossover on the evening of June 7, 1980. The State of Louisiana, through the Department of Transportation and Development, hereinafter DOTD, was conducting an overlay project to convert U.S. Highway 167 to a limited access highway, 1-49. As part of this project, the crossover was to be eliminated. The plaintiff was traveling south on U.S. Highway 167 in the inside left lane, and was going to utilize the crossover when he realized that the left turn lane had been removed. As he veered to the left expecting to enter the turn lane, his left front wheel dropped off of the pavement and was sheared off by the impact. The plaintiff began skidding, crossed the northbound lane of the highway and came to a stop after colliding with a parked car.
The plaintiff testified that he expected from prior experience for the left turn lane to be there, as he had used the turn lane before, and applied his brakes as he approached the crossover in preparation for making the turn. He stated that he had been traveling at approximately 55 miles per hour until he reached the area of the crossover, then slowed down to 25-30 miles per hour and signaled his intent to turn. He testified that there were no barricades or warning signs in the area. The evidence showed that the only signs along the roadway were `low shoulder' signs.
The State's senior inspector for this project, Darrell Richard, testified that the kind of warning devices used to inform motorists of hazards depend on the circumstances of the project. He was not sure if *697 cones or barrels were actually used on this project, but confirmed that cones are sometimes used to delineate a drop-off at a crossover. He stated that the project plans dictate signing procedures but the project engineer can add to these when necessary. He testified that the project engineer was aware of the drop-off situation at the crossover because he was there almost daily. He indicated that Barber Brothers always acted in conformity with the plans and specifications.
The court was impressed with the testimony of Duane [sic] Evans, a traffic engineer, who testified that there was a[n] 8 to 12 inch drop-off from the pavement, and that warning devices should have been placed in this situation. The court was particularly impressed with this expert's supporting reasons for his conclusions, and the apparent reliability of his research and data. From his testimony and that of DOTD's witnesses, the court finds that a[n] 8 to 12 inch drop-off presented an unreasonably dangerous risk to the motoring public. The DOTD had an affirmative duty to correct or warn against this danger. The type of warning required is outlined by the experts and the DOTD's employees. DOTD failed in its duty to adequately warn the motoring public of this dangerous situation.

PLAINTIFF'S NEGLIGENCE
At the time this accident occurred any negligence on the part of Bernard would have resulted in a total bar to his recovery. The comparative fault changes in our law had not yet come into existence. The trial judge found as a fact that Bernard was not negligent.
The DOTD claims that Bernard was negligent in failing to make a turn with which he was familiar. It contends that he should not have slammed on his brakes to make the turn but should have proceeded to the next U-turn. It also claims that he was intoxicated and that his intoxication was a contributing factor to the happening of the accident.
In Rue v. State, Dept. of Highways, 372 So.2d 1197 (La.1979), the Supreme Court found that a motorist who inadvertently drove off the highway onto its shoulder and who lost control of her vehicle upon striking an admittedly dangerous rut in the shoulder was not barred from recovery for her injuries by her negligence in leaving the paved surface of the highway. The Supreme Court reasoned that a motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Conversely, the Highway Department's or DOTD's duty to maintain a safe shoulder encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder.
However, at the time of this accident substandard conduct of a motorist would affect recovery if the motorist was aware of the dangerous condition of a highway shoulder and failed to take proper precautions to avoid running off the highway. Quinn v. State, through Dept. of Highways, 464 So.2d 357 (La.App. 3d Cir.), writs denied 467 So.2d 1134, 1136 (La.1985).
In the present case it was not controverted that the drop-off from the highway to the shoulder after the overlay of asphalt was an abrupt 8-12 inches. A turning lane that had previously been present had just been removed the day before the accident. Bernard had traveled this highway many times. He had used that turning lane many times. He admitted that he knew the roadway was under construction, but he said there were no signs indicating that the turning lane had been removed. He expected that the turning lane would be there. Without the turning lane, Bernard would have had to make a left turn directly at the crossover itself. He was unaware of these changed conditions.
Trooper Chargois testified that there was no type of light at the crossover nor any "low shoulder" signs. James Richard, an inspector with the DOTD, testified that there were "low shoulder" signs every half mile. However, there were none present at this particular crossover where motorists would be turning off the highway. Additionally there were neither barrels nor white or yellow lines *698 marking the edge of the highway. There were construction signs.
Duaine Evans, the expert traffic engineer whose testimony was relied upon by the trial judge, stated that a drop-off above 6 inches was unreasonably hazardous. In a situation like that, he stated that cones, barrels or vertical panels were usually used along the edge of the travel lane because new blacktop would be very black making it hard to distinguish where the edge of the road was. He stated that anyone who might try and use the turning lane would drop off.
Bernard was estimated to be traveling at 45-65 miles per hour. The posted speed limit due to construction was 45 miles per hour. Trooper Chargois opined that Bernard was traveling 55 miles per hour when he began to brake before the crossover. This was based on 174 feet of skid marks from where Bernard began braking to where he left the highway. Bernard stated that he was traveling 45-50 miles per hour. Evans estimated that he was going 58 miles per hour if all four wheels locked up and 41 miles per hour if only the front wheels locked up. Irvin Deranger, an engineer of the DOTD, estimated that Bernard was going 65 miles per hour if all four wheels locked up. Deranger's estimate was different from Evans because he used a different drag factor.
Although Bernard may have been exceeding the posted speed limit, we cannot say that the trial judge was in error in finding that speeding was not the cause of Bernard's failure to make the turn. Bernard left the highway 16 feet before the crossover. Bernard testified that he applied his brakes to slow down to turn where he expected there to be a turning lane. As he attempted to do so on the night of the accident, he went off the drop-off. This is when he lost control of his vehicle.
It was reasonable for the trial judge to conclude from this evidence that Bernard was not negligent in driving onto a turning lane that he thought still existed. Bernard was accustomed to the turning lane and the situation had been drastically altered only the day before. There was nothing to warn motorists that the turning lane had been removed. Furthermore, there were no devices to keep motorists from going off this steep drop-off and at this particular point where a turning lane had been located there was not even a "low shoulder" sign.
Evidence was introduced as to Bernard's possible intoxicated condition. Trooper Chargois stated that there was a heavy smell of alcohol on Bernard's breath. He also found that he spoke with slurred speech and was unsteady. He did not perform a field sobriety test. The trial judge noted that Bernard admitted he had had a few beers earlier during the day, but that he denied being intoxicated at the time of the accident.
This evidence was not sufficient to prove that Bernard was intoxicated at the time of the accident. There was no tangible evidence that intoxication was a contributing factor; the subject was left to speculation. The evidence was conclusive that Bernard lost control when he left the highway. There was no indication that the turning lane had been removed. This was all very hazardous to a motorist at night who expected a turning lane and who would have no way of knowing of its elimination at this unlit intersection. Any motorist exercising ordinary care for his own safety could have unknowingly driven off this steep drop-off and had an accident. We cannot say that the trial judge was clearly wrong in finding that the consumption of alcohol played no significant part in Bernard's accident.
We find no clear error in the trial judge's determination that Bernard was not contributorily negligent in causing this accident.

ADMISSIBILITY OF BLOOD ALCOHOL TEST RESULTS
Prior to trial, Bernard filed a motion in limine to exclude the results of a blood alcohol test, claiming that a proper foundation had not been established. The trial judge conducted a hearing and entered a judgment excluding these test results. The DOTD contends that the proper foundation had been established, and that the depositions relied upon for the foundation of the blood test and blood test results should have been *699 considered at trial in the weighing of the evidence.
A party seeking to introduce the results of a blood test in a civil case must first lay a proper foundation for its admission by connecting the specimen with its source, showing that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested. Richardson v. Continental Ins. Co., 468 So.2d 675 (La.App. 3d Cir.), writ denied 474 So.2d 1304 (La.1985).
After a review of the depositions in the record pertaining to the blood test and results, we agree with the trial judge that many of these requirements were not met. The blood was supposedly drawn by Mary Bellina who was the nurse at Lafayette General Hospital where Bernard was taken after the accident. The accident happened in 1980. She had no recollection of drawing blood from Bernard. She also could not swear that she initialed the seal on the test kit. She stated that the "M" looked like hers but she was not sure about the "B". Basically, Bellina could remember nothing about the drawing of the blood from Bernard.
Also, on the "Chain of Possession" form, there is no indication as to when the technician who performed the blood alcohol test personally received the kit. He also could not remember if Bernard's name was on the vials that contained the blood he tested.
At his first deposition, Trooper Richard Chargois, who investigated the accident and observed the drawing of the blood, could not remember if a nurse or doctor had drawn the blood. At his second deposition he believed he remembered that Bellina had drawn the blood when he looked at the seal on the blood kit.
We find that a proper foundation was not laid. It was not proven by a preponderance of the evidence that the blood eventually tested by the technician was that of Bernard. The evidence of Bernard's test results were properly excluded.
We doubt if the exclusion of the blood test was prejudicial. This was a judge trial. The DOTD was allowed to offer evidence through the testimony of several witnesses, including the admission of the plaintiff himself, that he had been drinking that day. The perceptions of the witnesses of his condition at the time of the accident were thoroughly explored. The DOTD was not otherwise restricted in its introduction of evidence of alcohol consumption as possibly being a contributing factor to the accident. The trial judge took this evidence into consideration, and we fail to see any ultimate prejudice to the DOTD's case by the exclusion of the test results.

CONTRACTOR'S LIABILITY
The DOTD also contends that the trial judge should have found that Barber Brothers was liable either in indemnity or in contribution for leaving a drop-off in existence which created an unreasonable risk of harm.

Indemnity
The DOTD claims it is entitled to indemnity from Barber Brothers which placed upon them the primary responsibility for the maintenance of the roadway, its shoulders, and the erection of signs in the construction zone. It relies on contract provisions found in the Louisiana Standard Specifications for Roads and Bridges dated 1977. The indemnity provision is found at Section 107.16 which provides:
107.16 RESPONSIBILITY FOR DAMAGE CLAIMS. The contractor shall indemnify the Department, its officers and employees from all suits, actions or claims of any character brought because of any injuries or damage received or sustained by any person or property on account of the operations of the said contractor; or on account of or in consequence of any neglect in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any negligent act, omission or misconduct of said contractor; or because of any claims or amounts recovered from any infringements of patent, trademark or copyright; or from any claims for amount arising or recovered under the Workmen's Compensation Act or any other law, ordinance, order or decree; and so much of the money due the said contractor under and by *700 virtue of his contract as may be considered necessary by the Department for such purpose, may be retained for the use of the State; or, in case no money is due, his surety may be held until such suit or suits, action or actions, claim or claims for injuries or damages as aforesaid have been settled and suitable evidence to that effect furnished to the Department; except that money due the contractor will not be withheld when the contractor produces satisfactory evidence that he is adequately protected by public liability and property damage insurance, including railroad protective liability insurance in accordance with Subsection 107.08.
This specific provision was interpreted by this court in Bantin v. State, Through Dept. of Transp., Etc., 411 So.2d 65 (La.App. 3d Cir.1982). This indemnity agreement was held not to impose liability on the contractor for the DOTD's negligent acts. See, also, Doherty v. Dept. of Transp. and Dev., 536 So.2d 682 (La.App. 3d Cir.1988), writ denied 537 So.2d 1171 (La.1989).
The DOTD has not appealed the trial judge's finding that it was negligent for this accident. Therefore, we find that Barber Brothers has no obligation to indemnify the DOTD.

Contribution
Under La.R.S. 9:2771, a contractor is immune from liability for the destruction, deterioration or defects of things built if he can prove he built the thing according to the plans and specifications furnished him since the contractor is not a guarantor of the sufficiency of the plans and specifications drawn by another person. La.R.S. 9:2771 does not require the contractor to prove fault or insufficiency of plans and specifications, but, rather, immunity results from proof of compliance alone. City of Covington v. Heard, 428 So.2d 1132 (La.App. 1st Cir.1983).
Even if the contractor proves that it followed the plans and specifications provided to it, it is not entitled to statutory immunity against third-party tort claims absent showing either that the situation created was not hazardous or that the contractor had no justifiable reason to believe a hazardous condition was created. Richard v. State through DOTD, 610 So.2d 839 (La.App. 1st Cir.1992), writ denied 614 So.2d 1264 (La.1993).
The project engineer and inspector on this job for the DOTD agreed that Barber Brothers had complied with the plans and specifications. The DOTD argues that Barber Brothers owed contribution because it had actual knowledge or at the very least constructive knowledge of the danger of the drop-off where plaintiff was injured, and failed to do anything about it.
In its reasons for judgment the trial court noted that the contract to Barber Brothers was but one of many let by the DOTD for this job. Barber Brothers' contract was for asphaltic overlay. Louisiana Paving Company, Inc., had the job of removing the turning lane. Charles Barber, an engineer and superintendent for Barber Brothers, testified that if he saw a hazardous condition like a drop-off of over 8 inches, then he would notify the DOTD. He stated that he would tell the DOTD first because too many signs can be put out. He would not do anything until advised by the DOTD because the DOTD controls the signs. The trial court noted that the DOTD project engineer testified that no additional signs could be placed by Barber Brothers without his express authority. Charles Barber testified that he could not remember what happened on June 7, 1980, and had no records for that particular day, but that had he been aware of a hazard, he would have notified the State and would have awaited their instructions.
Based on this testimony, we cannot say that the trial court erred in its finding that Barber Brothers was not a culpable party. On the basis of this finding of fact, Barber Brothers was properly found not to be liable as a contributing tortfeasor.
The amount of the damage award is not an issue on appeal.
For these reasons the judgment of the trial court is affirmed in all respects.
Costs of this appeal are assessed to the State of Louisiana, through the Department of Transportation & Development, to the extent *701 that it may be liable for the payment of costs.
AFFIRMED.