# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 05-928


**CALCASIEU PARISH SCHOOL BOARD**

**VERSUS**

**LEWING CONSTRUCTION CO., INC.  ET AL**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. 2002-4241
HONORABLE D. KENT SAVOIE, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*

## J. DAVID PAINTER
## JUDGE
\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and J. David Painter, Judges.

**REVERSED IN PART; AMENDED IN PART; AFFIRMED IN PART.**

**Joseph A. Delafield**
**3401 Ryan St., Ste. 307**
**Lake Charles, LA  70606**
**Attorney for Defendant-Appellant:**
 **Lewing Construction Co., Inc.**

**Michael G. Gaffney**
**Nolan P. Lambert**
**631 St. Charles Ave.**
**New Orleans, LA  70130**
**Attorney for Defendant-Appellant-Appellee:**
 **D & T Tile and Terrazzo, Inc.**

**Kraig T. Strenge**
**P.O. Drawer 52292**
**Lafayette, LA  70502**
**Attorney for Third Party Defendant-Appellant-Appellee:**
 **Lafayette Insurance Co.**

PAINTER, Judge.

This appeal arises from a trial court judgment apportioning fault for a defective floor among the Defendants, Lewing Construction Co, Inc. ("Lewing"), D & T Tile and Terrazo, Inc. ("D & T"), and Key Resin ("Key"), and finding coverage under a policy of insurance issued by Lafayette Insurance Company ("Lafayette") to D & T.

FACTS & PROCEDURAL HISTORY

In November 1996, the Calcasieu Parish School Board ("the School Board") contracted with Lewing to build an addition to the R. W. Vincent School ("the school") in Sulphur, Louisiana. C. Ray Fugatt was the architect for the project and, as such, drew the plans and set the specifications for the project. The plans called for an epoxy terrazzo floor. Lewing, the general contractor, lacking the expertise needed for installation of such a floor, subcontracted this part of the project to D & T. D & T obtained the epoxy resin needed for the floor from Key Resin Company. The floor was installed both in the new addition to the school and in part of a pre-existing cafeteria. Shortly after installation, an oily substance began to appear on the surface on the floor. Upon inspection, the substance appeared to be rising out of the floor through pinholes in the surface. Efforts at remediation were made by Lewing and D & T. Ultimately, Lewing paid for a different flooring installer to replace the epoxy terrazzo floor with a cement-based terrazzo floor.

The School Board filed this suit against Lewing and D & T. Lewing filed a cross-claim against D & T. D & T filed third-party demands against Key Resin and its own commercial general liability insurer, Lafayette. Prior to trial, the School Board dismissed its claim against Lewing. The third-party claims proceeded to trial.

2

At trial, much evidence was adduced to determine whether the problems with the floor were caused by defects in the slab, defects in the flooring materials, or defects in the installation of the floor. The trial court concluded that the oily substance was brought to the surface of the floor as a result of water vapor transmission from below and rendered written reasons in which it found as follows:

> This was the first time that C.R. Fugatt, the architect under the contract, had used this particular type of flooring, which was utilized to save money. His specifications for the job were that it conform to national standards, without really investigating what those standards were or whether or not they were obtainable in Southwest Louisiana. Lewing Construction took particular care with the job, since they understood that there may be a problem with water vapor transmission, but did no further investigation about what standards might be appropriate or what were obtainable and in particular, did not know what the terrazzo industry flooring standards were. D & T tested the floors using one of the manufacturer's suggested tests and D & T knew or should have known of the industry standards for water vapor transmissions. Key Resin instructed its suppliers on a method to test the water vapor transmission that was not trustworthy.

> As between the contractor and the subcontractor, Lewing and D&T tile, D&T Tile had the greater responsibility and knowledge to inform and advise the contractor about what the requirements were for the proper installation of a floor. However, the contractor is not free from fault and should have done some investigation of their own. I assess 20% of the fault for this floor's failure to Lewing Construction and the architect, which they will share equally, as I believe that the architect had an obligation to do a little further investigation as it concerns this type of flooring for which he had no prior experience. As between the installer and the manufacturer, I believe that they equally had a responsibility to know the capabilities of the product that they were selling and installing. Consequently, I assess 80% of the fault to the installer, who is entitled to recover 50% of what he is required to pay because of the fault of the manufacturer in failing to warn them of the particular problems with the test that it recommends be done.

> I am not convinced that any exclusions apply, consequently the insurance was in full force and effect for this work and therefore, D&T is entitled to recover what it has to pay from Lafayette Ins. Co.

3

The trial court rendered judgment as it set out in its reasons. The court assessed costs twenty-five percent to each of the Defendants. Lewing, D & T, and Lafayette appeal.

DISCUSSION

*Contractor's Liability*

Lewing asserts that the trial court erred in assessing it with twenty percent of the fault for the failure of the floor, because it fully complied with the architect's plans and specifications in pouring the slab on which the floor was installed. D & T argues that the trial court erred in finding it liable for the failure of the floor because it also followed the architect's plans and specifications. D & T contends that it had no reason to believe a hazardous condition was present because it was impossible to know the floor would, at certain times and under certain conditions, have a vapor transmission rate over that recommended by the manufacturer. Finally, D & T argues that the trial court erred in finding it liable for the floor's failure without finding that it improperly installed the floor. Key Resin has not appealed the trial court judgment. Therefore, we will not examine the trial court's finding as to its liability.

Both Lewing and D & T assert that the provisions of La.R.S. 9:2771 apply to relieve them of liability for the floor's failure. La.R.S. 9:2771 provides that:

> No contractor, including but not limited to a residential building contractor as defined in R.S. 37:2150.1(9), shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.

4

"La.R.S. 9:2771 does not require the contractor to prove fault or insufficiency of plans and specifications, but, rather, immunity results from proof of compliance alone. *City of Covington v. Heard*, 428 So.2d 1132 (La.App. 1st Cir.1983)." *Bernard v. State Through Dept. of (Highways) Transp. & Dev.*, 93-1376, p. 10 (La.App. 3 Cir. 6/1/94) 640 So.2d 694, 700, *writ denied*, 94-1814 (La. 10/14/94), 643 So.2d 165.

However, if the evidence shows that the defects were not the result of the insufficiency of plans and specification, but were the result of the quality of the work done by a contractor, that contractor will not be protected by the statutory immunity provided by La.R.S. 9:2771. *Allstate Enter., Inc. v. Brown*, 39,467 (La.App. 2 Cir. 6/29/05), 907 So.2d 904.

> [A] contractor is liable for damages if it is shown that he did not possess the necessary skill, efficiency or knowledge, or did not exercise ordinary care in performing work and is liable for losses, which the owner suffered because of the contractor's non-compliance with the contract. *Austin Homes, Inc. v. Thibodeaux*, 2001-1282 (La.App. 3d Cir.5/8/02) 821 So.2d 10, *writ denied*, 2002-2324 (La.11/15/02), 829 So.2d 436.

*Mount Mariah Baptist Church, Inc. v. Pannell's Associated Elec., Inc.*, 36,361, pp. 8-9 (La.App. 2 Cir. 12/20/02), 835 So.2d 880, 887, *writ denied*, 03-0555 (La. 5/2/03), 842 So.2d 1101.

Therefore, we will examine the evidence to determine whether and to what extent the defective floor resulted from the insufficiency of the plans and specifications and/or from a deficiency in the performance of a contractor.

C. Ray Fugatt, the architect who prepared the plans and specifications for the school addition and renovation, was accepted by the trial court as an expert in the field of architecture. He testified as follows. He was involved in review during the entire construction process. A new slab was poured for the addition and a topping of slab was applied in an area in the cafeteria. The new slab was above grade and,

5

because the site sloped, was two feet above the ground on the east side. He tried to get to the site once a week while the site was being prepared and soil compaction was being tested. No concrete was poured before the test results were received. He could have stopped construction if the results didn't meet his specifications. The plans called for an epoxy terrazzo floor because of cost considerations. The floor was installed in an air-conditioned space. The floor was accepted in December 1997, and the next summer Fugatt heard that there was a problem with it. Upon inspection, he found that everywhere the new epoxy terrazzo floor had been installed, there was an oily substance oozing out of pinholes in the floor. The floor appeared to be adhering to the slab properly. He assumed that the problems were to do with the terrazzo because he knew of no problems with the slab. He stated that he was not aware of any objection to the condition of the slab before the terrazzo floor was installed. The custom in the industry would have been for the slab contractor to leave it in a condition to receive the floor. The specifications call for Lewing to provide a subfloor in a suitable condition to receive terrazzo. He opined that it was for the flooring subcontractor to point out problems with the slab, whether with moisture or another problem, and that the flooring subcontractor should have required corrections if the floor would not perform properly due to problems with the slab. He made the specification for the terrazzo flooring a broad general performance specification which said it should be installed in accord with the National Terrazzo Institute standards, because he was not familiar with the national standards for epoxy terrazzo and wanted to put the burden on the flooring installer to do what was supposed to be done. He looks at the vapor transmission range that the manufacturer puts on a product in considering if it should be put on the slab. Fugatt admitted that he did not

6

know the maximum moisture transmission rate for epoxy terrazzo, but that someone should have tested the floor and, if it was transmitting vapor at an unacceptable rate, should have suggested a change.

Both Ralph Lewing, President of Lewing Construction, and Lewing's superintendent for the school job, Albert Bourgeois, testified as to the manner in which the slab was constructed. They explained the process as follows. The architect gives them the specifications. The site work is done first. Soil borings are done, the site is laid out and staked, and the contractors establish where it will obtain the materials for the dirt pad. A sample of the dirt is taken, and an engineer determines how much fill will have to be taken out of the site. At the school site, two or three feet of fill was removed. A filled dump truck is driven around the site to find soft spots, an engineer does a soil compaction test on the sub-base, and, if it passes, the fill-in process begins. After the site is filled, compacted ,graded, and tested, forms are set, and footings dug. A vapor barrier is placed (in this case, ten millimeter visqueen), anchor bolts are set, and footings poured. At the school site, the anchor bolts were covered with styrofoam blocks to prevent them breaking the vapor barrier. For the same reason, plastic stands were used to hold up the wire reinforcement. Drainage was installed. On this job, they chose not to make a single monolithic pour to prevent damage to the moisture barrier. Concrete was placed into the forms out of a hose. The concrete was tested throughout the pouring process to see if its water content was correct.

Lewing stated that no one ever told him that he did not comply with the specifications. He testified that if he had been given the technical data regarding the required moisture transmission rate for epoxy terrazzo, he would have suggested

7

testing it, but, in the absence of this data, he relied on the expertise of the flooring contractor.

Lewing first heard of the problems with the floor the summer after it was installed. He inspected the floor, then called D & T. He chipped out a piece of terrazzo and sent it to D & T. He also contacted Bob Cain, President of Key Resin. Cain sent him information on a variety of problems with terrazzo, but the floor's condition did not resemble anything illustrated in that information, which showed terrazzo peeling of the floor. He testified, as did all concerned, that the floor showed no peeling or delamination from the slab, but was oozing oil. Lewing stated that he checked for moisture problems by looking in a storage room where the slab had not been covered by terrazzo or other flooring. He reported that he found neither rust under a metal file cabinet nor moisture under a rubber floor mat. Having talked with Cain about a mat test, he taped a square of visqueen to the bare slab and, after thirty-six hours, found no moisture. Lewing testified that after attempts to solve the problem failed, he paid for another firm to remove the problem floor and install cement-based terrazzo. He testified that no problems with the floor have been reported since it was replaced.

David Dipol, President of D & T and a terrazzo mechanic, testified that his company has installed floors since 1984. Usually, a D & T representative does an inspection two weeks to a month before starting a job. Nothing out of the ordinary was found upon inspection of the school job site. Epoxy resin and hardener were obtained from Key Resin. However, the invoices introduced at trial indicate that the amount of hardener delivered to the site by Key Resin was insufficient for the amount of resin. Dipol explained this by saying that D & T frequently had sufficient hardener

8

in stock from previous jobs, and that D & T always over-orders so as not to run out. D & T cleaned the slab and inspected for cracks, scaling, movements, and moisture. The floor was shot-blasted to roughen the surface so that the terrazzo would better adhere. D & T normally checks for signs of moisture by looking for calcium effervescence, which would mean that moisture is coming through the slab and bringing calcium with it. Dipol admitted that he knew of no defect or deficiency in the slab, but insisted that something had to be wrong with the slab because nothing was wrong with the terrazzo. He felt that the terrazzo was not the problem because the product was mixed and applied as D & T has always done. He opined that the problem had to be with moisture or the terrazzo product. He felt that testing for moisture before the floor was installed would not have changed anything. He stated that moisture tests before installation were done to be sure the floor would adhere and the terrazzo would not have bonded to the slab if a moisture problem had been present at that time. Dipol admitted that no calcium chloride test, which would have given the exact moisture transmission rate, was run before the floor was installed. Only a mat test was done by taping a square of visqueen to the slab overnight. Dipol admitted that if a calcium chloride test shows a high vapor transmission rate, it is possible to coat the slab to lower the transmission rate.

Robert Cain, President of Key Resin, also testified at trial. He stated that installers are sent Key Resin's technical bulletin, one of which is entitled "Surface Preparation for Concrete and Wood Substrates." That bulletin recommends testing for moisture and states that moisture induced failure is the terrazzo industry's single largest problem. He stated that most installers do a moisture test of the slab and that he felt that a calcium chloride test should have been conducted. However, he could

9

not say whether D & T had received Key Resin's technical bulletin recommending the calcium chloride test. Moisture tests, according to Cain, are recommended not only to know the condition of the slab on the day of installation but for long term performance as well. However, he admitted that there was no warning with regard to the maximum vapor transmission rate on the product itself. He stated that Key Resin sells its material in proportions appropriate to mix. Cain testified that if too much hardener is put in the mix, there will be a faster hardening with an exudation of unreacted hardener. According to Cain, if too little hardener is mixed into the resin, a softer mass of material results. He opined that the problem with the floor was vapor transmission, but not at a sufficient rate to cause delamination.

Michael Aderman was accepted by the court as an expert in the field of structural engineering, particularly it as concerns concrete construction. He testified that he found no problem with the slab. He did not think the failure of the floor was caused by a defective slab especially since there were no floor problems in the areas that did not have terrazzo floors. He found the slab's moisture transmission rate to be 4.6 pounds per thousand square feet. He opined that a normal rate for slabs in southern Louisiana would be four to five pounds per thousand square feet. He explained that moisture transmission rates are lower inside buildings because it is dryer and moisture moves from below the slab where water pressure is higher to inside the building where pressures are lower. He stated that the vapor barrier has the biggest effect on reducing vapor transmission and that he saw nothing to indicate that there was a problem with the vapor barrier under the school. He opined that problems with terrazzo floors commonly occur where the workmen mix incorrectly, using the wrong proportions of materials or adding additional amounts of one component to try

10

to keep it liquid. However, he admitted that he had no evidence that this occurred in this case. He felt that if the epoxy manufacturer recommended that this type of floor not be installed if the slab had a moisture transmission rate in excess of three pounds per thousand square feet, the installer would be at fault for installing under those conditions.

Fritz Iselin, an independent consultant on high performance flooring used in commercial and institutional construction, was accepted by the court as an expert on terrazzo flooring. He stated that he saw no evidence of defective flooring materials. He testified that epoxy flooring usually calls for a vapor transmission rate of no more than three to four pounds per thousand square feet. It was Iselin's opinion that if environmental conditions at the time a calcium chloride test is run are not the same as they will ultimately be, the results of the test will not be correct. He stated that where the vapor transmission rate is 4.6 pounds per thousand square feet, he would expect to see delamination and oozing from blisters or domes. The condition he observed in the floor at the school was different, with oozing coming from pinholes in the terrazzo. When questioned as to whose job it is to decide if the particular floor is suitable for particular conditions, Iselin stated that the architect should write it into the specifications and the manufacturer would not be in a position to know whether the material were to be used on a ground floor or on a second story where vapor transmission would not be an issue. He opined that the general contractor and the installing contractor should step in to say if a particular product will present problems, but stated that the installer should know more about the requirements for the floor than anyone else on the job. He stated that it is good practice to run moisture tests and he would expect the floor installer to know them. He could not say

what the general contractor should have done, but opined that the installer should have done more tests.

*Liability of Lewing*

The testimony adduced at trial indicates that Lewing complied with the architect's plans and specifications. Fugatt's testimony indicates that the slab was poured in conformity with his plans and specifications. Fugatt testified in detail as to the appropriate manner for pouring the slab. Lewing testified as to the manner in which the slab at the school was poured, and it is clear that the slab was poured in conformity with the methods laid out by Fugatt. Lewing further stated that no one ever told him that the architect's specifications for the slab were not achieved. Fugatt indicated that no one objected to the condition of the slab prior to installation of the epoxy terrazzo floor. He further stated that, from the time the problem was noticed through the time of trial, no one ever told him that there was a problem with the slab being too porous or transmitting too much moisture. Aderman stated that no one indicated to him that the slab was not properly made and that he found no problems with the slab. Iselin stated that he did not know of anything that Lewing should have done prior to the installation of the floor to prevent its failure.

This court finds nothing in the evidence presented at the trial court which suggests that the work done by Lewing did not meet the architect's plans and specifications. Accordingly, we find that the trial court erred in finding Lewing at fault in connection with the failure of the floor. As a result, the trial court's judgment is reversed insofar as it assesses Lewing with fault for the failure of the floor.

*Liability of D & T*

The evidence shows that for a matter of several years prior to the installation of this floor, D & T had in its possession a technical bulletin from Key Resin which set out the required vapor transmission rate and the recommendation that, prior to installation of the floor, a calcium chloride test be run to determine the vapor transmission rate. It is undisputed that D & T failed to perform the calcium chloride vapor transmission test prior to installing the floor. Although D & T asserts that it would have been useless to perform the test prior to installation, other witnesses testified otherwise. Fugatt testified that it is standard in the construction industry for the flooring subcontractor to conduct moisture testing on the slab and tell him about the problem, ask for corrections, or suggest changes. Iselin, who testified as an expert in terrazzo, opined that a calcium chloride test conducted at the time the floor was installed would not have accurately reflected the vapor transmission rate when the building was completed, because after completion of the building the air conditioning would increase the vapor transmission. However, he stated that the terrazzo installer should have known more about the specifications than anyone else on the job, that the installer should have been aware of the tests, and that the installer should have done more tests and made further inquiries. Cain testified that D & T could not know whether a moisture problem was present unless a calcium chloride test was run.

Given the totality of this testimony, we find no error in the conclusion that D & T did not exercise ordinary care. Further, the evidence supports the conclusion that the defects were not entirely the result of the insufficiency of plans and specifications, but were, at least in part, the result of the quality of the work done by D & T.

*Apportionment of Fault*

Having reversed the finding that Lewing was at fault for the failure of the floor, we must re-apportion fault.

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Bouley v. Guidry*, 04-469 (La.App. 3 Cir. 9/29/04), 883 So.2d 1099, 1105-06, (quoting *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985)).

Given the evidence and testimony at trial and in light of the *Watson* factors, we find that the trial court correctly apportioned fault as concerns D & T and Key Resin. Further, we find that the architect, C. Ray Fugatt, is twenty percent at fault for the failure of the floor because of his failure to further investigate the requirements of an epoxy terrazzo floor before writing the specifications.

*Insurance Coverage*

Lafayette assigns as error the trial court's determination that its policy provided D & T with coverage for this situation. Lafayette argues that its policy excludes coverage for claims rising out of the quality of the insured's work citing a policy exclusion for improperly performed work and an exclusion for " 'property damage' to 'your product' arising out of it or any part of it," and "'property damage' to 'your work' arising out of it." However, after reviewing the policy we find that the failure of the floor was covered under the "Products-Completed Operations" coverage. We

14

note that while the policy refers to this coverage, there is no separate endorsement or rider which specifically describes that coverage. However, the declarations sheet of the policy shows that the coverage existed. Further, the policy states that:

14.a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1)    Products that are still in your physical possession; or

    (2)    Work that has not yet been completed or abandoned.

. . . .

17. "Your product" means:

    a.    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    (1)    You;

. . . .

19. "Your work" means:

    a.    Work or operations performed by you or on your behalf; and

    b.    Material, parts or equipment furnished in connection with such work or operations.

As in *Mike Hooks, Inc. v. JACO Servs., Inc.*, 95-1485 (La.App. 3 Cir. 5/8/96), 674 So.2d 1125, *writ denied*, 96-1924 (La. 11/1/96), 681 So.2d 1264, the policy herein purports both to provide coverage for "products-completed operations hazard" and apparently to exclude coverage of the same. In keeping with the holding of this court in that case, and with this court's recent opinion in *Supreme Svcs and Spec. Co. v. Sonny Greer, Inc.*, 04-1400 (La.App. 3. Cir. __/__/06), as well as the unchallenged line of jurisprudence concerning ambiguous terms in insurance policies, we must

15

interpret the terms to provide coverage. ___ So.2d. ___. Accordingly, we find no error in the trial court's determination that the policy provides coverage for the claims made against D & T.

*Attorney's fees*

Lafayette further asserts that the trial court erred in ordering it to pay attorney's fees in the amount of $6,500.00. D & T has asked for additional attorney's fees on appeal.

"Louisiana law is well settled that an insurer's failure to defend the insured on plaintiffs' allegations renders the insured liable for attorney's fees incurred by the insured in defense of a negligence action. *Steptore v. Masco Const. Co., Inc.*, 93-2064 (La. 8/18/94), 643 So.2d 1213, 1218." *Smith v. Reliance Ins. Co. of Ill.*, 01-888 (La.App. 5 Cir. 1/15/02), 807 So.2d 1010, 1022. Having found that Lafayette's policy did afford coverage, we further find that the trial court's award of fees is reasonable. Further, we award a $2,000.00 additional attorney's fee on appeal.

*Court Costs*

Having found that Lewing is not liable for the failure of the floor, we further reverse the assessment of court costs against him. Costs at the trial level are assessed thirty-three percent each to D & T, Key Resin, and Lafayette.

CONCLUSION

For these reasons, we reverse the trial court insofar as it found Lewing liable for the failure of the floor. Additionally, we find that the architect, C. Ray Fugatt was twenty percent at fault for the failure of the floor. We amend the award of attorney's fees to D & T and against Lafayette to reflect an additional $2,000.00 for the appeal of the matter. In all other respects, the award of the trial court is affirmed.

REVERSED IN PART; AMENDED IN PART; AFFIRMED IN PART.

16